**Raul Adam MARTINEZ, Jr., Appellant,**

v.

**The STATE of Texas.**

**No. PD–1917–06.**

Court of Criminal Appeals of Texas.

Dec. 17, 2008.

Frances M. Northcutt, Houston, for Appellant.

Eric Kugler, Asst. District Atty., Houston, Jeffrey L. Van Horn, State's Atty., Austin, for State.

## *OPINION*

JOHNSON, J., delivered the opinion of the Court, in which PRICE, WOMACK, HOLCOMB, and COCHRAN, JJ., joined.

Raul A. Martinez, Jr., appeals his conviction for capital murder.[1] Because the state chose not to seek the death penalty, the jury's finding of guilt resulted in a sentence of life in prison. The Thirteenth Court of Appeals upheld his conviction.[2] *Martinez v. State,* 204 S.W.3d 914 (Tex. App.-Corpus Christi 2006). This Court granted appellant's petition for discretionary review: "Whether the court of appeals misapplied the standards of *Seibert* in determining that a proper and functional *Miranda* warning was given appellant here and finding appellant's custodial statement admissible." We reverse.

### FACTS

In the early morning of August 2, 2003, Alfredo Balderas Loredo, Gustavo Camilo, and Manuel Arriaga Molina were socializing in the rear of an apartment complex in Houston when two men approached them with a rifle and a pistol. Two of the victims described the man carrying the rifle as a short, heavy, Hispanic male and the man carrying a pistol as a tall, skinny, Hispanic male. Mr. Balderas testified that the shorter man pressed the rifle into his abdomen and demanded money. Simultaneously, the taller man pointed the pistol at the other two victims and demanded money. Mr. Arriaga gave his wallet to the taller man, who responded by shooting Mr. Arriaga in the groin. Mr. Camilo also gave his wallet to the taller man, who responded by shooting Camilo in the stomach. The men pushed Mr. Balderas to the ground, took his wallet, shot him in the neck, and fled. Still alert, Mr. Balderas used his cell phone to call his brother-in-law, and his brother-in-law called the police. The three victims were taken to the hospital. Mr. Balderas was treated for his injuries and released that night. Mr. Camilo was hospitalized for a longer period of time and underwent multiple surgeries. Mr. Arriaga died a few hours after the incident.

Detectives Macario Sosa and Toby Hernandez of the Houston Police Department's homicide division investigated the case. There were no suspects until the officers were informed of a Crime Stoppers tip identifying appellant and James Ruiz as the primary suspects. Appellant matched the description of the short, heavy, Hispanic male, and Ruiz matched the description of the tall, skinny, Hispanic male. Mr. Balderas identified both appellant and Ruiz in a photo array. Mr. Camilo was able to identify only appellant. Officer Sosa secured a "pocket warrant"[3] for appellant's arrest.[4]

On November 18, 2003, Officer Sosa arrested appellant in a convenience-store

---

1. TEX. PENAL CODE § 19.03(a)(2).

2. The First Court of Appeals initially received appellant's appeal, but transferred the case to the Thirteenth Court of Appeals.

3. Officer Sosa testified that a "pocket warrant" is different from a regular arrest warrant in that it expires after 30 days, while a regular warrant expires when the suspect is arrested or the warrant is recalled.

4. Officer Sosa did not obtain a pocket warrant for James Ruiz's arrest because, at the time of the identification, Ruiz was deceased.

parking lot. Appellant was driving a late-model green Chevy Malibu.[5] At the time of his arrest, police did not give appellant *Miranda* warnings. At police headquarters, Officers Sosa and Hernandez questioned appellant about the robbery and murder. Appellant, however, denied knowing anything about the incident.

Shortly thereafter, Officers Sosa and Hernandez took appellant to a police polygrapher, who used the case file to develop the questions to be asked and then administered a polygraph test to appellant. This process took three to four hours to complete. The record does not reflect the name of the officer who administered the test, and when asked, Officer Sosa could not identify the officer.[6] Likewise, the questions that were asked during the polygraph examination are not in the record.

After the test, Officers Sosa and Hernandez again took custody of appellant, and Officer Sosa informed appellant that he had failed the polygraph exam.[7] Officer Sosa conceded that it is not customary for a suspect to be informed that he "failed" a test; suspects are usually informed that "deception was indicated on some of the test questions." The record is silent as to which questions the polygrapher determined that appellant had answered deceptively. Officers then took appellant to municipal court, where a magistrate gave appellant *Miranda* and other statutory warnings for the first time.

Upon appellant's prompt return to the central holding station, Officers Sosa and

Hernandez again questioned appellant about the robbery and murder. Officer Sosa repeated the *Miranda* warnings, and appellant gave a videotaped statement regarding the incident.[8] At the beginning of the video, appellant stated that he had become aware of certain facts about the crime through the polygraph examiner. Although before the polygraph appellant asserted that he was not aware of the robbery and murder, on the videotape appellant discussed pertinent information regarding the crime. Appellant further stated that he was not one of the assailants who had robbed and shot the victims, but rather was a "lookout" person. He maintained that he had remained in the backseat of his Chevy Malibu throughout the incident. Appellant had initially stated that there were only three persons involved, but after Officer Sosa informed him of conflicting information, he then stated that there were four persons involved in the incident. Appellant also asserted that the individual who was actually carrying the rifle resembled appellant and that they could easily have been mistaken for each other.

The state indicted appellant for capital murder. Before trial, appellant filed a motion to suppress his statement and requested a hearing. At the hearing on that motion, appellant sought to suppress the videotaped statement because he had not received *Miranda* warnings when he was arrested or before the polygraph examination. Officer Sosa was the state's sole

---

5. Appellant conceded that his Malibu had been used in the robbery.

6. Officer Sosa could not recall the polygrapher's name, but stated that it was a male officer.

7. Officer Sosa testified that he did not know this to be factually true, but that it had been communicated to him by the polygrapher.

8. The videotape was marked as state's exhibit 1. Portions of the interview are missing because the videotape was stopped at various points, and some portions were redacted from the record.

witness at the hearing. The trial court found Officer Sosa to be a credible witness, concluded that appellant had voluntarily and knowingly waived his right to remain silent, and admitted the videotaped statement.

On appeal, appellant's sole issue was that the "failure to *Mirandize* appellant before the initial interrogation and the polygraph examination led to constitutional error in the admission of his videotaped statement at trial." *Martinez*, 204 S.W.3d at 914. The court of appeals affirmed appellant's conviction, finding that appellant did not satisfy the five factors set out in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). It further stated that the admission of the videotaped statement did not constitute constitutional error because it was made after a proper and functional *Miranda* warning. *Id.* at 922.

In his petition to this Court, appellant's sole claim is that the court of appeals misapplied the standards of *Seibert* when it considered whether a proper and functional *Miranda* warning was given.

### SEIBERT

 Patricia Seibert was charged with murder. After her arrest, she gave a confession about the murder without being given *Miranda* warnings.[9] *Seibert*, 542 U.S. at 600, 124 S.Ct. 2601.[10] The detective returned 20 minutes later, gave *Miranda* warnings, and obtained a signed waiver and a second confession. Before trial, Seibert sought to exclude both the unwarned and warned statements. The Missouri trial court excluded only the unwarned statement, and the defendant was convicted of second-degree murder. The Missouri Supreme Court, however, reversed the defendant's conviction, stating that the interrogation was continuous and that the second statement was the product of the invalid first statement. The United States Supreme Court granted *certiorari.* A four-justice plurality also ruled that Seibert's warned statements were inadmissible. *Seibert*, 542 U.S. at 616, 124 S.Ct. 2601. The Court stated that

when a confession so obtained is offered and challenged, attention must be paid to the conflicting objects of *Miranda* and the question-first strategy. *Miranda* addressed "interrogation practices ... likely ... to disable [an individual] from making a free and rational choice" about speaking, 384 U.S. at 464–465, 86 S.Ct. 1602, and held that a suspect must be "adequately and effectively" advised of the choice the Constitution guarantees. *Id.* at 467, 86 S.Ct. 1602. Question-first's object, however,

---

9. "A officer from [the Rolla] police department testified that the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession was promoted not only by his own department, but by a national police training organization and other departments in which he had worked." *Seibert* at 609, 124 S.Ct. 2601.

10. In *Miranda v. Arizona*, the United States Supreme Court addressed "interrogation practices ... likely ... to disable [an individual] from making a free and rational choice" about speaking. *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court unequivocally ruled that an accused, held in custody, must be given the adequate and effective warnings "prior to questioning," not merely before signing a written statement after all the custodial interrogation is complete. *Id.* at 445, 86 S.Ct. 1602. The failure to give timely warnings generally results in the state being required to forfeit the use of any statement obtained during that interrogation during its case-in-chief. *Id.* When a defendant alleges that the *Miranda* protections were thwarted, the burden of showing admissibility rests on the prosecution. *Seibert*, 542 U.S. at 609, 124 S.Ct. 2601 (quoting *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

is to render *Miranda* warnings ineffective by waiting to give them until after the suspect has already confessed.... By any objective measure, it is likely that warnings withheld until after interrogation and confession will be ineffective in preparing a suspect for successive interrogation, close in time and similar in content. The manifest purpose of question-first is to get a confession the suspect would not make if he understood his rights at the outset. When the warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine,* 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*Id.* at 601, 124 S.Ct. 2601. The plurality further emphasized that

the threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 611–12, 124 S.Ct. 2601.

The plurality crafted a multi-factor test for determining "whether *Miranda* warn-

ings delivered midstream" could be effective.

The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615–16, 124 S.Ct. 2601.

Although agreeing "with much in the careful and convincing opinion for the plurality," Justice Kennedy's concurring opinion took a narrower view—*Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), should be followed unless there is proof that the interrogating officer knowingly and willing utilized the two-stage technique, thus undermining *Miranda* warnings. Justice Kennedy's focus was on "whether admission of the evidence under the circumstances would frustrate *Miranda's* central concerns and objectives." *Seibert* at 619, 124 S.Ct. 2601 (Kennedy, J., concurring). He stated that

[t]he plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on "whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object" given the specific facts of the case. This test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations.... In my view, [the plurality's] test cuts too broadly.... I would apply a narrower test applicable

only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.... *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. *Cf. Berkemer v. McCarty,* 468 U.S. 420, 430, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. *Cf. Westover v. United States,* decided with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 ... (1966). Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. No curative steps were taken in this case, however, so the postwarning state-

ments are inadmissible and the conviction cannot stand.

*Seibert* at 621–22, 124 S.Ct. 2601 (Kennedy, J., concurring). We find Justice Kennedy's reasoning persuasive.

### ELSTAD

Before *Seibert, Elstad* controlled when addressing *Miranda* warning violations and the corresponding confessions. In *Elstad,* a suspect spoke a single incriminating sentence at his home.[11] *Elstad,* 470 U.S. at 301, 105 S.Ct. 1285. Elstad had not received a *Miranda* warning before making the statement, apparently because the police officers did not believe that Elstad was in custody at the time of his statement. *Id.* Elstad was taken to the police station, where he received a proper warning, waived his *Miranda* rights, and made a second statement. *Id.* He later argued that the second statement should be suppressed because it stemmed from the unwarned first statement. *Id.* at 302, 105 S.Ct. 1285. The Supreme Court held that, although a *Miranda* violation made the pre-*Miranda*-warning statement inadmissible, the warned statements could be introduced against the accused because, given the facts of the case, "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression." *Id.* at 308, 105 S.Ct. 1285 (citing *Michigan v. Tucker,* 417 U.S. 433, 445, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)).

### ANALYSIS

■ This Court has not recently directly addressed midstream *Miranda* warnings such as those given in this case, but

---

11. The officer sat down with Elstad and asked him if he knew a person by the name of Gross, and he said that he did and added that he had heard that there was a robbery at the Gross house. At that point, the officer told Elstad that he felt that Elstad was involved in the robbery. Elstad looked at him and stated, "Yes, I was there."

before *Seibert*, in *Jones v. State*, 119 S.W.3d 766 (Tex.Crim.App.2003), we addressed facts similar to those presented here. Before receiving *Miranda* warnings, Jones orally admitted his involvement in two murders. *Id.* at 771–72. An officer wrote down the defendant's confession "verbatim" on a statement form. *Id.* After the first confession, the officer read the defendant the *Miranda* warnings that appeared at the top of the written form. *Id.* The officer and defendant read the statement simultaneously, then the defendant corrected mistakes, initialed revisions, and signed the statement at the bottom. *Id.* We declined to apply *Elstad*, stating that,

in contrast to *Elstad*, where the initial unwarned statement took place at the defendant's home and the warned statement was given after transporting the defendant to the police station, the unwarned and warned statements in this case were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process. The written statement [taken by Texas Ranger Akin] was literally a transcription of appellant's unwarned oral statement after he finally received his *Miranda* warnings; he simply signed the written statement that he

had dictated to [the police officer] before he was warned. To apply *Elstad* here and declare the [second] statement admissible by virtue of the late admonishment of the required warnings would undermine the spirit and intent of *Miranda*. The waiver of rights given in connection with the [second] statement was not constitutionally valid in light of the circumstances and entire course of police conduct.

*Jones,* 119 S.W.3d at 775. The *Jones* Court held that the second statement was inadmissible, but found that the error in admitting it was harmless beyond a reasonable doubt.

Here, the pertinent facts are undisputed: (1) appellant was in custody and under arrest for capital murder; (2) Officer Sosa did not give appellant *Miranda* warnings at the time of his arrest; (3) Officers Sosa and Hernandez questioned appellant about the crime at the police station without giving the required warnings;[12] (4) appellant did not receive *Miranda* warnings before being taken for a polygraph examination;[13] (4) the identity of the polygrapher and the polygraph-examination questions are not included in the trial or appellate record;[14] and (6) a

---

12. During cross-examination at the hearing on appellant's motion to suppress, Officer Sosa twice conceded that he failed to give appellant his proper warnings.

> [Defense]: When you got down to [the police station,] what's the first thing you do?
> [Officer Sosa]: We got to the [police station]. I gathered the case file information together so I'd have it at my disposal. I advised him of why he was arrested again and I asked him if he thought that he might want to speak with us. . . .
> [Defense]: Had you read [appellant] his rights at that time?
> [Officer Sosa]: Had I read him—I hadn't read him his rights at that time, no.
> \* \* \*
> [Defense]: Up until the time [you all] were going to the magistrate, you had not ad-

vised [appellant] that he had any of the rights that you later gave him on the videotape?
> [Officer Sosa]: I did not read him his rights formally, no.

13. There is no testimony in the record that appellant was told at any time that he could refuse to take the polygraph examination.

14. In the motion for new trial, appellant's counsel alleged that the state obtained the name of the polygrapher by calling the police department, but withheld this information until after trial began.

magistrate read the *Miranda* warnings to appellant only after both the first round of interrogation and the polygraph examination. Based on these facts, we have determined that "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning...." *Seibert* at 621, 124 S.Ct. 2601 (Kennedy, J., concurring).

The parties assert contrary positions as to the completeness and detail of the questions and answers in the first round of interrogation. Appellant contends that the court of appeals misapplied the *Seibert* factors by failing to place the burden of proof on the state to satisfy the five factors, including the questions from the first interrogation, and that it was the state's burden to show what questions were used during the polygraph examination.

The state contends that appellant has the burden of producing an adequate record and that he has failed to develop the record concerning what specific questions were asked during the polygraph examination and any of the unwarned conversations. *See Ortiz v. State,* 144 S.W.3d 225 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd) (stating that repeal of former rule (Rule 50(d)) of appellate procedure does not absolve appellant of his burden of presenting a record to show error requiring reversal insofar as he is required to develop record to show nature and source of an error).

The court of appeals took the same position, asserting that appellant did not submit an adequate record regarding the unwarned statements and questions asked during the polygraph examination. It stated that

at the outset, we note that there is no record of Martinez's pre-warning statements made to Officers Sosa and Hernandez or the polygraph examiner. The first two factors that the *Seibert*

plurality found relevant in determining whether *Miranda* warnings delivered midstream are effective are the completeness and detail of the questions and answers in the first round of interrogation and the overlapping content of the two statements. The dissent is troubled by Martinez's two references to the polygrapher telling him that three people were shot during the incident. Unlike *Seibert,* Martinez was repeating the polygrapher's general statements regarding the crime, not his own unwarned statements. Therefore, the first two *Seibert* factors are not applicable in Martinez's case.

*Martinez,* 204 S.W.3d at 921. Indeed, the record is lacking; it does not contain a complete, or even partial, description of the questions and answers in the first round of interrogation and polygraph test. Even so, this does not preclude analysis.

The state, as the proponent of the evidence of appellant's confession, bears the burden of establishing its admissibility. TEX. RULES EVID. 104(a). *See also De la Paz v. State,* 273 S.W.3d 671, 2008 WL 2437648, at *7, 2008 Tex.Crim.App. LEXIS 751, at *26–27 (Tex.Crim.App.2008); *Cofield v. State,* 891 S.W.2d 952, 954 (Tex. Crim.App.1994). Further, we have long held that the prosecution bears the burden of proving admissibility when a *Miranda* violation is found. *See, e.g., Creager v. State,* 952 S.W.2d 852, 860 (Tex.Crim.App. 1997); *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex.Crim.App.1995) (quoting *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). When the officers initially questioned appellant at the police station without giving him *Miranda* warnings, they violated appellant's constitutional rights. At the suppression hearing, the state failed to provide the polygrapher's name, the questions used during the polygraph examination, or the content of the

initial interrogation of appellant, all of which are under the exclusive control of the state.

■ The state also asserts that this case is distinguishable from *Seibert* because there is no evidence that appellant made any incriminating statements before he was given his *Miranda* warnings. We agree with Justice Kennedy (and the plurality in *Seibert*) that "not every violation of [*Miranda*] requires suppression of the evidence obtained. Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." *Seibert* at 618–19, 124 S.Ct. 2601 (Kennedy, J., concurring). In some cases, an officer might not recognize that a suspect is in custody and that warnings are therefore required. We also agree that the suppression of warned statements under such a circumstance would serve "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence." *Elstad*, 470 U.S. at 308, 105 S.Ct. 1285. Indeed, *Elstad* provides a practical approach to enforcing *Miranda* protections. "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. 1285. Contrary to *Elstad,* however, a *Miranda* warning given midstream, as in this case, requires a closer examination of the investigatory techniques used before and after *Miranda* warnings are given.

When a question-first interrogation begins, it cannot be known whether the suspect will incriminate himself, but the suspect's rights as set out in *Miranda* have already been violated. Although both *Elstad* and *Seibert* involved incriminating statements in the first interrogation that were repeated in the second, that was not the focus of the holdings. In both cases, the prime concern was the constitutional rights that the *Miranda* decision was intended to protect. *Seibert* at 611, 619, 621, 124 S.Ct. 2601 (whether warnings could function effectively, as *Miranda* requires (plurality); "whether admission of the evidence under the circumstances would frustrate *Miranda's* central concern and objectives"; whether the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning (Kennedy, J., concurring)). It is immaterial to our consideration whether incriminating statements emerged from the unwarned interrogation.

Here, appellant was in custody for the purposes of *Miranda;* he gave both statements to law-enforcement officials after his formal arrest pursuant to an arrest warrant, and both statements were given at a police station.[15] This indicates that the absence of *Miranda* warnings at the beginning of the interrogation process was not a mistake based on the interrogating officers' mistaken belief that appellant was not in custody, but rather a conscious choice.[16]

The state challenges the court of appeals's finding of continuity of police per-

---

**15.** Officer Sosa testified that the first interrogation took place at 1200 Travis and the second interrogation took place at 61 Reisner, the central holding area.

**16.** The *Seibert* plurality articulated that intent is not the dispositive factor in determining whether an officer used the question-first strategy "because the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation); the focus is on facts apart from intent that show the question-first tactic at work." *Seibert* at 617, 124 S.Ct. 2601.

sonnel, arguing that there was a "substantial break" between the two statements; and that, therefore, the interrogation was not continuous. The record does not support this argument.[17]

The interrogation process was lengthy. Officer Sosa testified that he arrested appellant midmorning and that he and Officer Hernandez first questioned appellant regarding the case around 10:00 a.m. Shortly after the first interrogation ended, appellant was taken to the polygrapher and given a polygraph examination, which took three to four hours. Immediately following the polygraph examination, appellant was taken to the municipal court, where a magistrate administered *Miranda* warnings at approximately 5:00 p.m., seven hours after the first questioning. After being arraigned, appellant was returned to the central holding station and gave his videotaped, warned, second statement at approximately 5:15 p.m.[18]

Determining whether a suspect was in the continuous presence of police personnel cannot be accomplished by focusing on only the lapse of time between the two statements; it is determined by considering all of the events that occurred between the unwarned statement and warned statement. Throughout the day of his arrest on this charge, appellant was with police officers or other police department personnel or detained in a police facility. The same officers conducted the first and second periods of questioning, and aside from the time during which the polygraph test was administered by another police officer, they were both continuously with appellant. From arrest to questioning to polygraph to magistrate to questioning, the presence of police personnel was uninterrupted. We discern no "substantial break in time and circumstances between the prewarning statement and the *Miranda* warning."

Appellant asserts that the court of appeals erred in failing to consider that Officers Sosa and Hernandez did not tell him that all of the prior questioning was improper and that it could not be used against him. The state argues that appellant was properly warned of his rights and waived them before giving his videotaped statement.

It is evident that the officers treated the videotaped interrogation as a continuation of the first; as in *Seibert*, at the beginning of the second interrogation, Officer Sosa referred to the first interrogation and restated what he had told appellant during the first interview.[19] While the questions and answers from the first round of interrogation are not in the record, we can conclude from Officer Sosa's reference to the first interrogation that appellant could

---

17. The *Seibert* plurality stated that "it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Seibert* at 614, 124 S.Ct. 2601. "As Justice Souter points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited mid-interrogation, after inculpatory statements have already

been obtained." *Seibert* at 620, 124 S.Ct. 2601 (Kennedy, J., concurring).

18. Officer Sosa also testified that they fed appellant at some point during the day, and that appellant was allowed to call his father and girlfriend, but Officer Sosa could not give a specific time.

19. [Officer Sosa]: Remember, I told you that I'm not going to yank your chain; [that] I'm not going to bull [s]h* * around?

[Appellant]: Yeah.

reasonably assume that a continuity existed between the two interrogations.

On the video, Officer Sosa began by reading the *Miranda* warnings to appellant. He then asked appellant if he understood his rights, and appellant replied affirmatively. Both officers, however, failed to inform appellant that, based on the lack of *Miranda* warnings, any prior statement made during a previous interrogation, including the polygraph exam, could be not used against him.

The polygraph test, in and of itself, poses great concern. Before taking the polygraph, appellant denied knowing about the crime. Officer Sosa failed to inform appellant that he could refuse to take the polygraph test or that, after starting the test, he could stop at any time. *See generally* Tex.Code Crim. Proc. art. 15.051. At the conclusion of the test, Officer Sosa informed appellant that he had "failed" the test without indicating that the results showed deception as to some answers, nor did he tell appellant which questions appellant had answered deceptively. As previously noted, the polygraph examiner, and the facts learned by appellant from the polygraph examiner, were mentioned by appellant and the officers in the video. It has long been the rule in this state that references to a polygraph test, or to its results, are inadmissible for all purposes. *See Nesbit v. State* 227 S.W.3d 64, 66 (Tex.Crim.App.2007) (quoting *Nethery v. State,* 692 S.W.2d 686, 700 (Tex.Crim.App. 1985)). Hence, the officers had the responsibility to inform appellant that the questions asked during polygraph test, or the test results, could not be used at trial and that any mention of the test at trial was likewise prohibited. This, coupled with the fact that the officers initiated the conversation regarding the first interrogation, likely created the belief in appellant's mind that he was compelled to again discuss the matters raised in the first interview during the second interview.[20]

If the deliberate two-step strategy has been used, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Seibert* at 619, 124 S.Ct. 2601 (Kennedy, J., concurring). We agree that "curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* Examples of appropriate curative measures include: (1) a substantial break in time and circumstances between the unwarned statement and the *Miranda* warning (Kennedy);[21]

**20.** The *Seibert* plurality emphasized that

[i]t seems highly unlikely that a suspect could retain any such understanding when the interrogator leads him a second time through a line of questioning the suspect has already answered fully. The point is not that a later unknowing or involuntary confession cancels out an earlier, adequate warning; the point is that the warning is unlikely to be effective in the question-first sequence we have described.

*Seibert* at 614 n. 5, 124 S.Ct. 2601.

Justice Kennedy noted that

[t]he technique used in this case distorts the meaning of *Miranda* and furthers no legitimate countervailing interest. The *Miranda* rule would be frustrated were we to allow police to undermine its meaning and effect. The technique simply creates too high a risk that postwarning statements will be obtained when a suspect was deprived of "knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine,* 475, U.S. 412, 423–24, 106 S.Ct. 1135 ... (1986).

*Seibert* at 621, 124 S.Ct. 2601 (Kennedy, J., concurring).

**21.** The state's assertion must also fail because the polygraph test, which was not completed until approximately 4:30 p.m., was an integral part of the unwarned statement. Less than

(2) explaining to the defendant that the unwarned statements, taken while in custody, are likely inadmissible (Kennedy); (3) informing the suspect that, although he previously gave incriminating information, he is not obligated to repeat it (plurality); (4) the interrogating officers refrain from referring to the unwarned statement unless the defendant refers to it first (plurality); or (5) if the defendant does refer to the pre-*Miranda* statement, the interrogating officer states that the defendant is not obligated to discuss the content of the first statement (plurality).[22] No curative steps were taken in this case.

The officers had the responsibility of applying curative measures at the beginning of the second interview, or, at the very least, when they referred to the first interrogation of appellant. They did neither. Such omissions or actions are not likely "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). Curative measures allow the accused "to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.*

In this case, the officers did not apprise appellant of his *Miranda* rights when they began custodial interrogation and failed to

apply any curative measures in order to ameliorate the harm caused by the *Miranda* violation. Appellant's videotaped statement was therefore inadmissible. We reverse the judgment of the court of appeals and remand this cause to the court of appeals so that it may conduct a harm analysis.

PRICE, J., filed a concurring opinion.

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., and MEYERS and KEASLER, JJ., joined.

PRICE, J., filed a concurring opinion.

This case was tried over a year before the Supreme Court issued its opinion in *Missouri v. Seibert.*[1] The appellant's brief in the court of appeals was filed a week before *Seibert.*[2] The court of appeals's resolution of the appellant's only claim on appeal was thus hampered by a record that was developed *in anticipation* of a Supreme Court opinion, rather than in light of already-established Supreme Court precedent. There is no claim that the issue was not properly preserved for appeal, however, and *Seibert* would apply retroactively to any case pending on direct appeal, as this one was.[3] Once a defendant has shown that his statement was made as a result of custodial interrogation,[4] the State has the burden to establish

an hour after the polygraph test ended, police began the second interrogation process, thereby leaving an insubstantial break between the two interrogations.

**22.** These examples are nonexclusive, but they provide guidance as to when curative measures are needed.

**1.** 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

**2.** *See Martinez v. State,* 204 S.W.3d 914, 924 n. 19 (Tex.App.-Corpus Christi 2006) (Yanez, J., dissenting).

**3.** *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

**4.** *See Herrera v. State,* 241 S.W.3d 520, 526 (Tex.Crim.App.2007) (State has no burden to show *Miranda* compliance unless record "clearly establishes" defendant's statement was product of custodial interrogation). Here, it is undisputed that the appellant was under arrest from the outset of his interaction with the police, and any inquiry of the appellant about the offense by the police after that, including during the polygraph examination, unquestionably constituted interrogation.

compliance with *Miranda*.[5] I do not know whether that burden should extend to disproving circumstances that precede the *Miranda* warnings that might suffice, in contemplation of *Seibert*, to call the efficacy of those warnings into doubt. I am, therefore, not entirely unsympathetic with Judge Hervey's view of matters. However, the State itself has never complained that it has been saddled with an inappropriate burden of proof in this case. In any event, even were we to hold that the burden more appropriately falls upon the appellant to prove circumstances that would impugn the efficacy of otherwise valid *Miranda* warnings, I believe that on the record before us it can be said that he has carried that burden, if only barely.

The debate in the court of appeals centered around which of the opinions in *Seibert* was the controlling one, the plurality opinion of Justice Souter or the narrower concurring opinion of Justice Kennedy. Applying the Souter plurality as authoritative, the majority of the court of appeals held that the appellant had failed to show that the pre-*Miranda* contact with the police, including the polygraph, undermined the effectiveness of the *Miranda* warnings.[6] Applying the Kennedy concurrence, which she deemed controlling, the dissenting justice would have held that the police deliberately failed to *Mirandize* the appellant before subjecting him to the polygraph examination, and took no curative measures to assure the efficacy of the subsequent warnings.[7] Without expressly resolving (or even addressing) this dispute in the lower court, the Court today simply declares Justice Kennedy's view of the law "persuasive," and seems to adopt it. I agree that we do not need to reach the issue of which opinion is controlling, since, in my view, the appellant should prevail under either test.

As both Judge Hervey and the court of appeals point out, we know almost nothing on the present record about the substance of the initial interrogation or the polygraph examination. Assuming for the sake of argument that the burden rests with the defendant, ordinarily this gap in the record would prove fatal to a *Seibert* claim, which on its face is predicated upon the fact that the police obtained a presumptively coerced *confession* before *Mirandizing* the suspect. Here, what little the record does reveal about the appellant's pre-*Miranda* contact with police is that he steadfastly denied any involvement in the offense until after he was warned. But the record also shows that, after he submitted to the polygraph examination, the appellant was immediately informed that he had failed it. We do not know specifically in what respect his answers may have been deceptive, but we can be sure that the police told him they knew of his deception in an effort to wear down his resistance to confessing to them, by demonstrating to him that they already "had the goods" on him.[8] To me, this is the

---

5. *See Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (statements made during custodial interrogation are inadmissible "unless and until [*Miranda*] warnings and waivers are demonstrated by the prosecution at trial[.]"); *Colorado v. Connelly*, 479 U.S. 157, 167–68, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (State has burden to show waiver of *Miranda* rights).

6. *Martinez v. State, supra*, at 918–921.

7. *Id.* at 924–28.

8. Judge Hervey complains that the record does not indicate whether the appellant was *Mirandized* at the outset of the polygraph examination. Dissenting opinion, at 10 n. 18. It is undisputed that the appellant was under arrest when he submitted to the polygraph examination, the quintessence of police interrogation. The State therefore had the burden to prove he had been *Mirandized* at this juncture. *See* n. 5, *ante*. A silent record on this point must militate against the State.

determinative circumstance in this case. It satisfies both the Souter and the Kennedy criteria for establishing an ineffective mid-interrogation *Miranda* warning.

In explaining why warnings given after a confession has already been elicited may not serve as the constitutionally adequate prophylaxis that *Miranda* envisioned, Justice Souter observed:

> After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing the warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.[9]

The same "sensible underlying assumption" pertains to the interrogator's use of a failed polygraph. A suspect who has been interrogated and confronted with the fact that his denials did not pass a lie-detector test would not likely appreciate his right to remain silent, even once *Miranda* warnings are administered, when the police begin to "lead him over the same ground" with respect to which his mendacity has already been revealed. This is especially so if the tardy *Miranda* warnings cause him reasonably to believe that evidence of his mendacity on the polygraph examination *can and will* be used against him. A failed polygraph is practically as effective as a coerced confession in so demoralizing a suspect that subsequent *Miranda* warnings will lack their intended efficacy. I agree with the Court that, given the continuity of the appellant's interrogation and his interrogators,[10] "a reasonable person in [his] shoes would not have understood [mid-stream *Miranda* warnings] to convey a message that [he] retained a choice about continuing to talk." [11]

Justice Kennedy would require that the use of the question-first tactic was a deliberate choice of the police interrogators. The police waited more than six hours after questioning had begun to take the appellant to the magistrate to have him *Mirandized*. But they had him *Mirandized* immediately after informing him that he had failed the polygraph. It is fair to infer from these circumstances that the whole day's interrogation up to that point had been aimed *either* at eliciting a pre-*Miranda* confession that they could then have him repeat, or at demoralizing him to the point that a post-warning confession would be forthcoming. Indeed, it is hard to imagine what else could explain the lengthy delay in *Mirandizing* him after he was plainly under arrest and the police obviously desired to, and did in fact, question him about the offense. The Court is justified in its *de novo* conclusion that the

---

**9.** *Seibert, supra,* at 613, 124 S.Ct. 2601.

**10.** Majority opinion, at 625–26.

**11.** *Seibert, supra,* at 617, 124 S.Ct. 2601.

police utilized a deliberate tactic, calculated to undermine the appellant's will to resist talking before *Miranda* warnings could steel his resolve.[12]

Both Justice Souter and Justice Kennedy would look to see whether some curative measures may have been taken.[13] I agree with the Court that there was no meaningful break in the time or circumstances of the day-long interrogation sequence such that the demoralizing effects of the appellant's learning he had failed the polygraph examination would have worn off. Nor was the appellant informed as part of the *Miranda* warning he eventually received that failing the polygraph examination was not a circumstance that could be used against him at his trial (both because it came prior to any *Miranda* warnings and because the results of polygraph examinations are deemed generally too unreliable to be admissible in criminal trials in Texas). Because no such ameliorating circumstances exist, I conclude, like the Court,[14] that the *Miranda* warnings "could [not] have served their purpose," [15] and that the appellant's confession therefore should have been suppressed.

With these additional observations, I join the Court's opinion.

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., MEYERS and KEASLER JJ., joined.

The federal constitutional decision in *Miranda v. Arizona*[1] establishes the prophylactic rule that an in-custody suspect must be "warned" that he has certain rights, such as the right to remain silent, before the police can question the suspect. In this case, appellant basically claims that, even though he received these warnings before he voluntarily made a custodial videotaped statement to the police, these warnings nevertheless failed to "adequately and effectively" apprise him of his rights under *Miranda*.

The majority opinion appears to decide that Justice Kennedy's one-judge concurring opinion in *Missouri v. Seibert*[2] contains the Court's holding in that case. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (where "a fragmented Court decides a case and no single rationale explaining the result en-

---

**12.** There is no dispute about the historical facts. Neither is there any application of law to fact that turns on the demeanor or credibility of Officer Sosa, the only witness at the suppression hearing. Although the facts were not as well developed as could be hoped for, the facts that *were* elicited were essentially unchallenged. Thus, the reviewing courts may review the question of the efficacy of the mid-stream *Miranda* warning *de novo*. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000).

**13.** *See Seibert, supra,* at 616, 124 S.Ct. 2601 (plurality opinion) (Seibert's interrogating officer, in administering *Miranda* warnings, "said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not

be used."); *id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring) ("For example, a substantial break in time and circumstances between the pre-warning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. * * * Alternatively, an additional warning that explains the likely inadmissibility of the pre-warning custodial statement may be sufficient.")

**14.** Majority opinion, at 625–27.

**15.** *Seibert, supra,* at 617, 124 S.Ct. 2601.

**1.** 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** 542 U.S. 600, 618–22, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (Kennedy, J., concurring in the judgment).

joys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds") (internal quotes omitted).[3] The majority opinion also appears to decide that appellant wins under the "holding" in Justice Kennedy's concurring opinion in *Seibert*, because the incomplete record that appellant has presented establishes that a "two-step interrogation technique was used [in this case] in a calculated way to undermine the *Miranda* warning." *See* Maj. op. at 623.

The court of appeals' majority opinion decided that Justice Souter's four-judge plurality opinion in *Seibert*[4] contains the Court's holding because, even though Justice Kennedy's one-judge opinion concurred in the judgment on "narrower" grounds, the "underlying rationales of Justice Kennedy's concurrence and [Justice Souter's] plurality opinion are so divergent that they render *Marks's* narrowest-grounds-interpretation rule inapplicable." *See Martinez*, 204 S.W.3d 914, 918–21 (Tex.App.-Corpus Christi 2006).[5] The court of appeals' majority opinion, however, decided that appellant loses under Justice Souter's plurality opinion. *See id.* The court of appeals' dissenting opinion

would have decided that Justice Kennedy's "narrower" one-judge concurring opinion in *Seibert* contains the Court's holding under der *Marks's* narrowest-grounds approach and that appellant should win under this holding. *See Martinez*, 204 S.W.3d at 924–28 (Yanez, J., dissenting).[6] I would decide that it is unnecessary to determine whether Justice Souter's or Justice Kennedy's plurality opinions in *Seibert* control the disposition of this case because appellant has not carried his burden to present a sufficient record showing that he wins under either one of these opinions. *See Word v. State*, 206 S.W.3d 646, 651–52 (Tex.Cr.App.2006) (appellate courts should not presume error from a silent record and it is the appealing party's burden to present a record showing properly preserved, reversible error); *Rowell v. State*, 66 S.W.3d 279, 280–81 (Tex.Cr.App.2001).

Appellant was convicted of capital murder (murder committed during a robbery) and sentenced to life in prison.[7] The evidence from appellant's trial shows that three people were shot during a robbery committed by appellant and another person, both of whom used firearms. One of the robbery victims died from his gunshot wounds. The other two independently

---

**3.** *See* Maj. op. at 621 (finding Justice Kennedy's reasoning persuasive).

**4.** *See Seibert*, 542 U.S. at 604–18, 124 S.Ct. 2601 (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ.).

**5.** If this were so, Justice Souter's plurality opinion in *Seibert* could not contain a majority holding and would have little, if any, binding effect in this case. Under these circumstances, the Supreme Court's majority opinion in *Oregon v. Elstad* would arguably control the disposition of this case, and appellant would lose. *See Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("a suspect who has once responded to unwarned yet noncoercive questioning is not thereby disabled from

waiving his rights and confessing after he has been given the requisite *Miranda* warnings"); *see also Seibert*, 542 U.S. at 612 n. 4, 124 S.Ct. 2601 (suggesting that the defendant would have lost under *Elstad*); *but see Seibert*, 542 U.S. at 622–29, 124 S.Ct. 2601 (O'Connor, J., dissenting, joined by Rehnquist, C.J., and Scalia and Thomas, JJ.) (suggesting that defendant might have won under *Elstad*).

**6.** The court of appeals' dissenting opinion, therefore, would have decided that appellant wins under a "narrower" holding than the one that the court of appeals' majority opinion decided that appellant loses under.

**7.** The state did not seek the death penalty.

identified appellant as one of the robbers from a photospread approximately two months after the incident.[8] They also identified appellant at trial as one of the robbers. The police questioned appellant on the day of his arrest, and appellant voluntarily made the videotaped custodial statement at issue in this case in response to police questioning after receiving and waiving his *Miranda* rights. This statement was admitted into evidence at appellant's trial. Appellant claimed in this statement that he was in a nearby car acting as a lookout while others robbed the victims.[9] The state claimed at appellant's trial that appellant's statement was unworthy of belief, but that even this self-serving statement was sufficient to establish appellant's guilt.[10]

Appellant claimed on direct appeal that the trial court erroneously denied a motion to suppress this statement. Addressing the merits of this claim under the United States Supreme Court's fractured decision in *Seibert*, the court of appeals decided that *Seibert* did not require suppression of appellant's statement. We exercised our discretionary authority to review this decision.[11]

8. During closing jury arguments, the state claimed that it was significant that both victims independently identified appellant as one of the robbers (apparently comparing the chances of this to winning the lottery):

[STATE]: Mr. Camilo couldn't look at him or point at him. They scared the hell out of him. But what's their motive? And, furthermore, let me ask you this, gee, because I want in on this. What are the odds that those two little Mexican men are going to pick the same defendant, the same man that had the shotgun pointed at them that night who also owns a shotgun, who also has a skinny friend that meets the description that was given by the name of James Ruiz and that also the defendant himself puts himself there? What are the odds? Boy, if that was a lottery ticket, we would all be rich and never have to work again. Wouldn't that be nice?

9. Appellant's statement was the only evidence presented at appellant's trial that did not place appellant at the scene of the robbery where the victims were shot. All of the other evidence shows that appellant was at the scene of the robbery. Though the greater weight of the evidence presented at appellant's trial establishes that appellant was one of two armed robbers at the scene of the robbery, this evidence also raised a legitimate question of whether appellant actually fired his weapon. Our review of the trial record indicates that whether appellant actually fired his weapon, and not whether he was at the scene of the robbery, was probably the most legitimately disputed factual issue at appellant's trial.

10. For example, the state argued during closing jury arguments at appellant's trial:

[STATE]: If you believe this defendant's statement, you take everything he says as true, says it here twice on this tape: I was a lookout. I was sitting in the car, looking around, knowing these guys were going to get a lick. You're a lookout and you're guilty of capital murder.

* * *

Now [appellant's lawyer], would have you and she went on about, you know, this confession and all this suggestiveness and et cetera, et cetera, et cetera, as though the officers put these words in her client's mouth. Well, you know what? I watched that tape and you've got it in evidence and I counted at least seven times where the defendant in that particular tape says he's either a lookout or he's watching out. I don't believe that. I think that statement is totally self-serving and I think you probably all do, too. You're intelligent.

* * *

Well, you know what? If you want to believe that statement, you go right ahead, but even—if you believe that statement, I don't, but if you do and it's up to you, you are the judges of the evidence before you. You believe it, fine. But if you believe what he says in that statement, he's guilty of capital murder.

11. The ground upon which we granted review states:

Whether the Court of Appeals misapplied the standards of *Seibert* in determining that

In *Seibert,* a police officer consciously decided to interrogate the in-custody defendant without providing *Miranda* warnings and obtained a confession. *See Seibert,* 542 U.S. at 604–06, 124 S.Ct. 2601. After about a twenty-minute break, this same police officer provided the defendant with *Miranda* warnings and obtained basically the same confession after more interrogation during which the interrogating officer also confronted the defendant with some of her prior unwarned statements. *See id.* A Missouri trial court suppressed the initial unwarned confession, but admitted the later warned one. *See id.* The Missouri Supreme Court decided, in what appears to be a type of "fruit of the poisonous tree" analysis, that "[i]n the circumstances here, where the interrogation was nearly continuous, ... the second [warned] statement, clearly the product of the invalid first statement, should have been suppressed." [12] In its fragmented decision, a Supreme Court majority rejected a "fruits" analysis but ultimately agreed with the Missouri Supreme Court that the second warned confession should have been suppressed. *See Seibert,* 542 U.S. at 604–18, 124 S.Ct. 2601 (Souter, J., joined by Stevens, Ginsburg and Breyer, JJ.) and at 618–22 (Kennedy, J., concurring in the judgment).

Justice Souter's plurality opinion in *Seibert* decided that this confession should have been suppressed, because by "any

objective measure ... it is likely that if the interrogators employ the technique of withholding warnings until after the interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content" and would "likely mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights." [13] Justice Souter's plurality opinion also described the facts in that case, which bear very little resemblance to the facts in the record that appellant has presented in this case:

At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. (Footnote omitted). The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously

---

a proper and functional *Miranda* warning was given Appellant here and finding Appellant's custodial statement admissible.

**12.** *See State v. Seibert,* 93 S.W.3d 700, 701 (Mo.2002), *aff'd,* 542 U.S. at 617, 124 S.Ct. 2601; *but see Seibert,* 542 U.S. at 612 n. 4, 124 S.Ct. 2601.

**13.** Justice Souter's plurality opinion sets out "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their

object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *See Seibert,* 542 U.S. at 615, 124 S.Ct. 2601; *see also Martinez,* 204 S.W.3d at 917, 921 (applying these factors to uphold admissibility of appellant's voluntary custodial statement).

elicited. In particular, the police did not advise her that her prior statement could not be used. (Footnote omitted). Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" (Citation to record omitted). The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk. (Footnote omitted).

*See Seibert*, 542 U.S. at 616–17, 124 S.Ct. 2601.

Justice Kennedy's concurring opinion asserted that Justice Souter's plurality opinion "cuts too broadly" by applying "an objective inquiry from the perspective of the suspect" to "both intentional and unintentional two-stage interrogations." *See Seibert*, 542 U.S. at 621–22, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment). Justice Kennedy stated that he "would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *See id.* Apparently agreeing with the rest of Justice Souter's plurality opinion, Justice Kennedy further stated that, where a "deliberate two-step strategy" is used, the postwarning statements "that are related to the substance of prewarning statements" must be excluded unless curative measures are taken before the postwarning statement is made. *See id.* These curative measures "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *See id.* "For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *See id.*

In this case, appellant filed a motion to suppress his statement about a month before his trial began. His motion to suppress alleged, in relevant part, that:

> The written statements, admissions or confessions, if any were made, do not reflect that the proper admonitions were given, in violation of **Article 38.22, Section 2 of the Texas Code of Criminal Procedure;** the **Fifth, Sixth** and **Fourteenth Amendments** to the **United States Constitution;** and **Article I, Section 10 of the Texas Constitution.**

(Emphasis in original).

The only witness to testify at the suppression hearing was Officer Macario Sosa. He testified that he arrested appellant for this offense and took him to a police station, where they arrived at about 10:30 a.m. Appellant denied any involvement in the offense when Sosa and another officer asked appellant if he wanted to discuss it.

Sosa testified that he had not "read [appellant] his [*Miranda*] rights at that time."[14]

Apparently not satisfied with appellant's answer denying any involvement in the offense, Sosa then arranged for appellant to take a polygraph examination. These arrangements took about an hour during which time appellant was not questioned by the police.[15] Although Sosa did not specifically inform appellant that "he didn't have to take the polygraph or talk to anybody about this offense," he did ask him if he was willing to do so.[16] An "unknown polygrapher" conducted the polygraph examination, which lasted about three or four hours until about 4:30 p.m. Sosa was not present during the polygraph examination. Sosa testified at the suppression hearing that he did not know whether the polygraph examiner informed appellant of his *Miranda* rights.

Q. [DEFENSE]: So the polygraph examiner gives the person information as they're asking questions about the offense; is that correct?

A. [SOSA]: I wasn't present so I can't tell you exactly what happened during the examination.

Q. So you can't say for sure that the polygrapher did not provide him with details of the offense in order to ask him questions?

A. I can't say whether he provided details and *Miranda* warnings, what have you, no, ma'am.[17]

---

14. The majority opinion asserts that the police "questioned appellant about the crime at the police station without giving the required [*Miranda*] warnings." *See* Maj. op. at 622–23. The record that appellant has presented reflects that, when Sosa initially brought appellant to the police station, appellant denied any involvement in the offense when Sosa and another officer asked appellant if he wanted to discuss it. The police asking appellant if he wanted to discuss it is not "interrogation" for *Miranda* purposes. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("interrogation" is any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response); *Moran v. State*, 213 S.W.3d 917, 922–23 (Tex.Cr.App.), *cert. denied,* —— U.S. ——, 128 S.Ct. 235, —— L.Ed.2d —— (2007) (police officer's comment to in-custody defendant that the police had spoken to other witnesses just after defendant had invoked his right to counsel when police asked defendant if he wanted to discuss the offense was not "interrogation" thus not requiring exclusion of defendant's subsequent incriminating statement). The police were, therefore, not required to provide *Miranda* warnings before asking appellant if he wanted to discuss it. Even if it could be said that the police "questioned appellant about the crime" for *Miranda* purposes when they initially brought him to the police station, appellant's denial of any involvement in the offense after the police asked him if he wanted to discuss it

was nothing like the twenty or thirty minute, unwarned interrogation in *Seibert* that produced the defendant's incriminating statement, which she repeated about twenty minutes later during the same interrogation. *See Seibert*, 542 U.S. at 604–05, 124 S.Ct. 2601.

15. Sosa testified that the polygrapher reviews the entire case file in order to decide which questions to ask during the polygraph examination.

16. The record appears to reflect that appellant agreed to take the polygraph examination after Sosa asked him if he was willing to do so.

Q. [DEFENSE]: Like I said, up until that time, you had never given him any indication that he didn't have to take the polygraph or talk to anybody about this offense?
A. [SOSA]: I had basically asked him if he was willing to take a polygraph in regards to this incident.

17. The court of appeals (as does this Court) apparently considered this testimony to mean that appellant was not *Mirandized* before the polygraph examination. *See Martinez*, 204 S.W.3d at 921 ("The instant case presents a *Seibert* problem because [appellant] made pre-*Miranda* statements to police officers and a polygraph examiner, was then given separate *Miranda* warnings by a magistrate and the interrogating officers, and finally ap-

When the polygraph examination was over, Sosa was informed by the polygraph examiner that appellant had "failed" it.[18] The record is otherwise silent on just exactly what occurred during the three to four-hour polygraph examination.[19]

Sosa informed appellant that he had "failed" the polygraph examination[20] and then took appellant before a magistrate, who informed appellant of his *Miranda* rights at about 4:55 p.m. Sosa then took appellant to another police station where Sosa again informed appellant of his *Mi-* *randa* rights at about 5:16 p.m. This was the first time that Sosa personally informed appellant of his *Miranda* rights. Appellant waived these rights and voluntarily provided the statement at issue in this case while being questioned by Sosa and another officer. The police stopped questioning appellant at 6:08 p.m. During this interview of appellant, the police did not refer to, or confront appellant with, any statements (incriminating or otherwise) that appellant may have made during the polygraph examination and the police

---

peared in a videotaped interrogation that was admitted into evidence at trial."). This testimony, however, does not establish that appellant was not *Mirandized* before the polygraph examination. The record is actually silent on this critical issue under Seibert. This issue is critical under *Seibert*, because, if appellant was *Mirandized* before the polygraph examination, then he loses under any reading of *Seibert*.

18. The record is silent on which portions of the three to four-hour polygraph examination that appellant "failed." For all we know, appellant could have "failed" portions of the polygraph that were unrelated to this offense (e.g., appellant could have given a false name resulting in him "failing" the polygraph). Sosa also testified that it would be more accurate to say that "Deception was indicated" on certain questions, but that he did not know "the precise questions that were asked that supposedly reflected deception."

> Q. [DEFENSE]: I believe I said earlier that you told [appellant] he failed. In fact, that's not what a polygraph examiner would say to you; isn't that true? Someone doesn't fail or pass a polygraph, do they?
> A. [SOSA]: No, that's not a correct term.
> Q. So it would be more correct to say the polygraph expert or examiner would say to you: Deception was indicated on this question or that question?
> A. They would have given a percentage or degree of deception, yes, ma'am, per question.
> Q. But, again, without those records, you don't recall the precise questions that were asked that supposedly reflected deception?

> A. No, ma'am.

19. *See Martinez*, 204 S.W.3d at 916 (noting that a "record was not created of the questions, statements, or results of the polygraph examination"); *compare Seibert*, 542 U.S. at 613, 124 S.Ct. 2601 ("The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid.").

20. Arguably, this is the only evidence that might raise a viable issue under *Seibert*, since it is possible that appellant "would hardly think he had a genuine right to remain silent" after being told that he had "failed" a polygraph examination. One could speculate on this silent record that appellant, having initially denied any involvement in the offense when first brought to the police station, continued to deny any involvement in the offense during the polygraph examination and that, when confronted by the police with having "failed" the polygraph, he hardly thought he had a genuine right to remain silent (in part because he could have thought that the "failed" polygraph could be used against him later at trial) and, thus, after receiving his *Miranda* warnings twice, gave the somewhat incriminating statement that minimized his involvement in the offense but still placed him at the scene (the statement that the state argued at trial still established his guilt). This is another reason why it might be critical for the record to reflect whether or not appellant received *Miranda* warnings before the polygraph examination and what actually occurred during the polygraph examination.

did not repeat that appellant had "failed" the polygraph examination.[21]

Appellant's closing statement at the suppression hearing presented a smorgasbord of reasons for suppressing appellant's statement. None of these reasons, however, presented a claim that appellant's statement, "clearly the product of [any] invalid first statement, should have been suppressed"[22] or that appellant had not been "adequately and effectively" apprised of his *Miranda* rights before he made this statement.[23]

> [DEFENSE]: Your Honor, just preliminarily, we note the lack of an expressed waiver of rights at the beginning of the videotape basically with the detective, knowing these rights, do you want to talk? There is no express waiver of the rights; however, more importantly, we ask you to consider the day-long worth of activities that seem to be quite vague in Detective Sosa's mind, the lack of any record-keeping, the inability to explain what's been going on, what was talked about all day long, the lack, most importantly, of any reading of rights or *Miranda* warnings during all the questioning that occurred throughout the day by

the polygraph examiner and then through these huge blanks of time up until the trip to the magistrate, which did not occur until almost 5:00 o'clock. We submit those are not sufficient intervening circumstances to remove any taint. First of all, the lack of warnings before the day's questioning and then on the tape itself. We urge you to consider the coercive techniques that are used, the argumentation of [appellant's] refusal to accept his denials of guilt, the suggestion made that there is evidence that exists when it doesn't truly exist and so forth. And we also urge you to consider Detective Sosa's lack of memory concerning the events surrounding the taking of the statement also raise some question about the credibility involved with regard to what he says about what was done. We urge you to suppress the statement.[24]

In its closing statement at the suppression hearing, the state argued that appellant voluntarily made the statement after receiving, understanding and waiving his *Miranda* rights.

> [STATE]: Very brief, Judge. All I would do is reoffer, of course, the video-

---

**21.** *Compare Seibert,* 542 U.S. at 616, 124 S.Ct. 2601 ("When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. [Footnote omitted]. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, **and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying 'we've been talking for a little while about what happened on Wednesday the twelfth,**

**haven't we?'** [Citation omitted]. **The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given.**") (emphasis supplied).

**22.** *See Seibert,* 93 S.W.3d at 701.

**23.** *See Seibert,* 542 U.S. at 611–13, 124 S.Ct. 2601.

**24.** It is also noteworthy that appellant raised no claim or issue during the suppression hearing that Sosa informing him that he had "failed" the polygraph examination caused the subsequent giving of the *Miranda* warnings to him to be ineffective such that he "hardly [thought] he had a genuine right to remain silent."

tape that you heard and take into consideration everything that Officer Sosa said in terms of [appellant] not being forced, threatened, promised, anything in any way to give the statement that he did, that his *Miranda* warnings were given properly, they were read off the blue card, State's Exhibit No. 2. Specifically after each warning, the defendant was asked whether or not he understood that right. He did. He did it again on the videotape. He was—not only purchased food and drink, allowed to go to the rest room, allowed to make phone calls, bottom line, Judge, is his statement was voluntarily made.[25]

The trial court denied appellant's motion to suppress based on findings that appellant "did freely, voluntarily and knowingly waive his rights to remain silent and give that statement." The trial court made the following ruling:

[THE COURT]: I am going to admit the statement. I make a specific finding I have found Officer Sosa to be a credible witness. The arrest warrant is a good arrest warrant. It appeared that [appellant] did freely, voluntarily and knowingly waive his rights to remain silent and give that statement. There was no testimony of any threats. The

behavior of Officer Sosa appears to be exemplary and it is admitted.[26]

When the state offered appellant's statement into evidence at appellant's trial just two days after the suppression hearing, appellant reurged his "earlier objection" and for the first time directed the trial court's attention to *"Missouri v. Seibert."*

[STATE]: At this time I'm going to offer 1A into evidence.

[DEFENSE]: Your Honor, at this time we reurge our earlier objection and just to add to it, a reference to *Missouri v. Seibert,* S–E–I–B–E–R–T, U.S. Supreme Court case, pending, No. 02–1371.[27]

[THE COURT]: My ruling stands the same. Admitted.

Appellant's claim for suppressing his statement became even more focused and clear in his brief on direct appeal. In addition to containing a citation to the Missouri Supreme Court's decision in *Seibert,* appellant's brief on direct appeal also presented the argument that the admission into evidence of his statement was constitutional error, because "the unwarned and the warned questioning occurred as an uninterrupted and continuous process."

---

**25.** Appellant made no claim that this failed to address whether the *Miranda* warnings that he received before making the statement "adequately and effectively" apprised him of these rights.

**26.** Appellant made no claim that this ruling failed to address any claim that the *Miranda* warnings that appellant received before making the statement did not "adequately and effectively" apprise him of these rights.

**27.** It is, therefore, clear that appellant could have alerted the trial court to the Missouri Supreme Court's decision in *Seibert* during the suppression hearing just two days before. Appellant's trial took place between May 19, 2003, and May 23, 2003, with the motion to suppress hearing also occurring on May 19,

2003. The Missouri Supreme Court had handed down its decision in *Seibert* about six months before this on December 10, 2002. *See State v. Seibert,* 93 S.W.3d at 700. On May 19, 2003, the Supreme Court exercised its writ of certiorari jurisdiction to review the Missouri Supreme Court's decision. *See Missouri v. Seibert,* 538 U.S. 1031, 123 S.Ct. 2091, 155 L.Ed.2d 1059 (2003). The Supreme Court handed down its decision in *Seibert* on June 28, 2004, about one week after appellant filed his brief on direct appeal in the court of appeals. *See Seibert,* 542 U.S. at 600, 124 S.Ct. 2601; *Martinez,* 204 S.W.3d at 924 n. 19 (Yanez, J., dissenting). Appellant's brief on direct appeal also cited to the Missouri Supreme Court's decision in *Seibert.*

Among other things, appellant argued in his brief on direct appeal:

> What occurred here was that the un-warned interrogation process, including submitting Appellant for polygraphing, was used tactically to get Appellant to make admissions before he was aware of his legal rights. That Appellant eventually received his warnings before the video recorder was turned on was too little too late after about hours [sic] of custodial interrogation.

In *Miranda*, the Supreme Court, having concluded that in-custody interrogation of a suspect by the police is "inherently compelling," decided that it was constitutionally necessary for the police to **"adequately and effectively apprise[ ]"** the in-custody suspect of certain rights, such as the right to remain silent, before interrogation can begin in order "to combat these [inherently compelling] pressures and to permit [the suspect] a full opportunity to exercise the [Fifth Amendment] privilege against self-incrimination (sic)." *See Miranda,* 384 U.S. at 445–58, 467, 86 S.Ct. 1602 (emphasis supplied).[28] Justice Souter's plurality opinion in *Seibert* decided that the "question-first" interrogation technique of informing an in-custody suspect of his *Miranda* rights in the middle of a "coordinated and continuing interrogation" after the suspect has fully confessed does not "adequately and effectively apprise[ ]" this suspect of his rights. *See Seibert,* 542 U.S. at 611–14, 124 S.Ct. 2601. This opinion states:

> When a confession so obtained is offered and challenged, attention must be paid to the conflicting objects of *Miranda* and question-first. *Miranda* addressed

"interrogation practices … likely … to disable [an individual] from making a free and rational choice" about speaking, (citation omitted), and held that a suspect must be **"adequately and effectively"** advised of the choice the Constitution guarantees, (citation omitted). The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed.

Just as "no talismanic incantation [is] required to satisfy [*Miranda's* ] strictures," (citation omitted), it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*' " (Citations omitted). The threshold issue when interrogators question first and warn later is thus whether it would be [objectively] reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of inter-

---

**28.** There is no Fifth Amendment right "against self-incrimination." The Fifth Amendment right at issue in *Miranda* and cases like this is a person's right not "to be **compelled** in any criminal case to be a witness against himself" (emphasis supplied).

U.S. Const. amend. V. Requiring an in-custody suspect to be informed of his *Miranda* rights before the police can question him apparently is intended to safeguard this right. *See Miranda,* 384 U.S. at 467, 478–79, 86 S.Ct. 1602.

rogation as distinct from the first, unwarned and inadmissible segment. (Footnote omitted).

There is no doubt about the answer that proponents of question-first give to this question about the effectiveness of warnings given only after successful interrogation, and we think their answer is correct. By any objective measure, applied to the circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling trouble. **Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.** (Footnote omitted). A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." (Citation omitted). By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Id.* (emphasis supplied).

Justice Souter's plurality opinion in *Seibert,* therefore, sets out a rule that first providing *Miranda* warnings to an in-custody suspect in the middle of a nearly continuous interrogation after the suspect has just confessed is the same as providing no *Miranda* warnings at all. If the police then obtain another warned confession during this nearly continuous interrogation process in the absence of any "curative measures," this confession must be suppressed, since this confession will be considered to have been obtained without the requisite prophylactic *Miranda* warnings.[29] *See Seibert,* 542 U.S. at 611–16, 124 S.Ct. 2601. Justice Kennedy's concurring opinion apparently agrees except to require "that the two-step [or question-first] interrogation technique was used in a calculated way to undermine the *Miranda* warning." *See Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment).[30] Both of these opinions,

---

**29.** *See Seibert,* 542 U.S. at 608, 124 S.Ct. 2601 (*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights); *Miranda,* 384 U.S. at 476, 86 S.Ct. 1602 (giving of warnings is prerequisite to admissibility of custodial confession).

**30.** The court of appeals' majority opinion in this case, therefore, may have erroneously

therefore, considered it significant (almost dispositive) that the unwarned interrogation produced a confession that was repeated almost verbatim a very short time later (about twenty minutes) during a warned interrogation. The statement in this Court's opinion that it "is immaterial to our consideration whether incriminating statements emerged from the unwarned interrogation"[31] ignores the most significant component of *Seibert* that led the Court to conclude that the *Miranda* warnings provided to the defendant, just twenty minutes after she provided a complete confession during an unwarned interrogation, failed to "adequately and effectively" inform the defendant that she did not have to provide another confession. *See, e.g., Seibert,* 542 U.S. at 615, 124 S.Ct. 2601 (some relevant facts that "bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object" are "the completeness and

detail of the questions and answers in the first round of interrogation [and] the overlapping content of the two statements").

Assuming that appellant preserved a *Seibert* claim for appellate review,[32] appellant has not presented a record showing that he is entitled to relief under *Seibert.* The record does not show that the police actually used the "question-first" interrogation technique described in *Seibert,* and that, if they did use such a tactic, they did so in a calculated way to undermine the *Miranda* warning. This record does not support a finding that appellant had just confessed during a nearly continuous and uninterrupted interrogation process when Sosa informed appellant of his *Miranda* rights and obtained the statement at issue here.[33]

The incomplete record that appellant has presented does show that, when appellant was first brought to the police station, the police did not interrogate him for pur-

---

decided that "the underlying rationales of Justice Kennedy's concurrence and the plurality opinion [of Justice Souter] are so divergent that they render *Marks's* narrowest-grounds-interpretation rule inapplicable." *See Martinez,* 204 S.W.3d at 920. It would appear that Justice Kennedy's concurring opinion might contain the holding in *Seibert* under *Marks's* narrower-grounds approach. *See also Martinez,* 204 S.W.3d at 920 n. 5 (noting that the Fifth Circuit has decided in two recent unpublished decisions that Justice Kennedy's concurrence sets out the holding in *Seibert* ). The defendant in *Seibert* won under Justice Souter's and Justice Kennedy's plurality opinions apparently because these opinions agreed that the question-first interrogation technique in *Seibert* was used in a calculated way to undermine and did undermine the *Miranda* warning. *See Seibert,* 542 U.S. at 616 n. 6, 124 S.Ct. 2601 (Souter, J.) and at 620 (Kennedy, J.).

**31.** *See* Maj. op. at 625.

**32.** Arguably, the record from the suppression hearing reflects that neither the trial court, based on its ruling at the suppression hearing,

nor the state, based on its closing statements at the suppression hearing, understood appellant to be making a claim based on the principles discussed in either the United States Supreme Court's or the Missouri Supreme Court's decisions in *Seibert* (which could explain the lack of a complete record on what exactly occurred during the polygraph examination, particularly a critical issue under *Seibert* of whether appellant actually received *Miranda* warnings prior to the polygraph examination). *See Buchanan v. State,* 207 S.W.3d 772, 775 (Tex.Cr.App.2006) ("When the objection is not specific, and the legal basis is *not* obvious, it does not serve the purpose of the contemporaneous-objection rule for an appellate court to reach the merits of a forfeitable issue that is essentially raised for the first time on appeal.") (emphasis in original).

**33.** *Compare Jones v. State,* 119 S.W.3d 766, 775 (Tex.Cr.App.2003) (defendant's warned statement inadmissible because "the unwarned and warned statements in this case were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process").

poses of *Miranda*[34] and appellant did not make any unwarned incriminating statements that the police later used during the warned interview. And, because the record is silent on exactly what occurred during the polygraph examination, it is difficult, if not impossible, to conclude that something may have transpired during this polygraph examination to cause the subsequent giving of the *Miranda* warnings to be ineffective.[35] Such a conclusion would be based on pure speculation.[36] The record that appellant has presented does not establish that someone in appellant's position "would hardly think that he had a genuine right to remain silent" when he voluntarily provided the custodial statement at issue in this case after being informed of and waiving his *Miranda* rights. *See Word*, 206 S.W.3d at 651 (appealing party has burden to present a record

showing properly preserved, reversible error).

The majority opinion permits appellant to win by presenting an incomplete record showing no reversible error with gaping holes of silence on critical issues, based on the assertion that this Court has "long held that the prosecution bears the burden of proving admissibility when a *Miranda* violation is found." *See* Maj. op. at 623 (citing *Creager v. State*, 952 S.W.2d 852, 860 (Tex.Cr.App.1997) and *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Cr.App. 1995)). The cases cited in the majority opinion do not support a holding that the appealing party can present an incomplete and silent record showing no reversible error and win.[37]

The majority opinion's citation to *Creager* cites to a concurring opinion in *Creager*

---

34. And even if it could be said that the single question by the police to appellant asking him if he wanted to discuss it was interrogation for *Miranda* purposes, it is clear that this does not resemble the unwarned interrogation in *Seibert* that produced a confession.

35. Appellant presented no evidence at the suppression hearing (such as, for example, he was not informed of his *Miranda* rights before the polygraph examination or that he fully confessed during this examination) that would even raise an issue of whether something may have transpired at the polygraph examination or thereafter that might have caused the subsequent giving of the *Miranda* warnings to be ineffective. *Compare Seibert*, 542 U.S. at 605–06, 124 S.Ct. 2601 (interrogating officer testified at suppression hearing that he "made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught; question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once' ") and 542 U.S. at 616 n. 6, 124 S.Ct. 2601 (noting that the "intent of the [interrogating] officer will rarely be as candidly admitted as it was here"). Under these circumstances, the state never assumed any burden to prove that the polygraph examination (or any interrogation

technique that the police could have been using) caused the subsequent giving of the *Miranda* warnings to be ineffective. *See State v. Kelly*, 204 S.W.3d 808, 819 n. 22 (Tex.Cr. App.2006) (state does not assume burden to prove voluntariness of a defendant's confession unless the defendant carries initial burden to present evidence to support finding of involuntariness) (citing *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex.Cr.App.1999).

36. It is significant that the videotaped interview clearly reflects that the police did not refer to, or confront appellant with, any statements (incriminating or otherwise) that appellant may have made during the polygraph examination. *See Seibert*, 542 U.S. at 604, 124 S.Ct. 2601 (interrogating officer follows unwarned confession with *Miranda* warnings "and then leads the suspect to cover the same ground a second time") and at 605 (during warned interrogation, interrogating officer confronts suspect with her unwarned statements); *Martinez*, 204 S.W.3d at 921 (noting that appellant "was repeating the polygrapher's general statements regarding the crime [that three people were shot], not his own unwarned statements").

37. Our case law is actually to the contrary. *See Word*, 206 S.W.3d at 651–52.

which sets out the unremarkable proposition that "[w]hen the State bears the burden of proof on a motion in which the defendant seeks to suppress a statement, which he claims was obtained in violation of *Miranda*, the State need prove waiver only by a preponderance of the evidence." *See Creager*, 952 S.W.2d at 860 n. 2 (Meyers, J., concurring). *Alvarado* did not involve a claimed *Miranda* violation, and the defendant in *Alvarado*, rather than relying on an incomplete and silent record, actually testified and presented other evidence at a suppression hearing that raised the issue of the voluntariness of his confession before the state was put to its burden to prove voluntariness. *See Alvarado*, 912 S.W.2d at 210–11; [38] *see also State v. Kelly*, 204 S.W.3d at 819 n. 22 (state does not assume burden to prove voluntariness of a defendant's confession unless the defendant carries initial burden to raise an issue of involuntariness of the confession).

A defendant has always been required to make some initial showing on the record in the trial court that raises a legitimate issue of whether he is entitled to relief under the

specific claim that he presents (usually by making an evidentiary showing that would support the claim). *See Herrera v. State*, 241 S.W.3d 520, 526–27 (Tex.Cr.App.2007) (mere filing of motion to suppress does not thrust burden on the state to show compliance with *Miranda* unless and until defendant proves that statements he wishes to exclude were result of custodial interrogation) and at 533–34 (Cochran, J., concurring) ("The right to *Miranda* warnings applies once the defendant establishes that the setting is one of custodial interrogation. [Footnote omitted]. Only then does the State have a 'heavy burden' to establish that *Miranda* warnings were given and that the defendant voluntarily waived those rights and voluntarily responded to custodial questioning.").[39] Only then does the burden shift to the state to defeat this specific claim with its failure to do so being grounds for a successful appeal by the other party. *See id.* The Court's decision is based on the state's failure to prove something that it never had the burden to prove, because appellant never "raised" the issue.[40]

---

**38.** Rather than relying on a silent record, the defendant in *Alvarado* actually presented evidence that, if believed by the factfinder, would have supported a finding that the defendant's confession was involuntary placing the burden on the state to prove voluntariness. *See Alvarado*, 912 S.W.2d at 210–11.

**39.** *See also Kelly*, 204 S.W.3d at 819 n. 22 (defendant had initial burden to produce evidence to support finding that she did not consent to blood draw); *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Cr.App.2005) (defendant, claiming Fourth Amendment violation, bears initial burden of producing evidence to support finding of improper police conduct such as proving that a search occurred without a warrant shifting the burden to the state to establish the validity of the search); *Terrazas*, 4 S.W.3d at 727 (state never assumed burden to prove voluntariness of defendant's confession because defendant did not carry her initial burden of raising an issue of voluntariness).

**40.** For example, appellant's suppression motion did not raise an issue of the effectiveness of the *Miranda* warnings that appellant received. Appellant's suppression motion alleged that "proper admonitions" were not given. This is quite different from alleging that "proper admonitions" were given but that these "proper admonitions" did not "adequately and effectively" apprise appellant of his rights under *Miranda*. The allegation in appellant's suppression motion and the arguments he made at the suppression hearing certainly did not put any burden on the State to prove that these "proper admonitions" were ineffective. The state responded to the only claim presented in appellant's suppression motion when it proved at the suppression hearing that "proper admonitions" were, in fact, given.

Arguably, appellant's citation to *"Seibert"* during the middle of trial two days after the suppression hearing raised the issue of the effectiveness of the warnings. I would, how-

In this case, the state carried its "heavy burden" in the trial court to establish that *Miranda* warnings were given and that appellant voluntarily waived his *Miranda* rights and voluntarily responded to custodial questioning producing the videotaped statement at issue in this case. If appellant really meant to put the trial court and the other party on notice that it needed to prove that these warnings really did not "adequately and effectively" apprise him of these rights, then he should have said so instead of remaining silent. In other words, he should have "raised" this issue.

I respectfully dissent.

ever, decide that this, coming as it did just two days after the suppression hearing in the middle of trial without any further explanation of why *"Seibert"* would require a differ-ent result, still did not raise any issue as to the effectiveness of the warnings under *Seibert*.