**Affirmed and Opinion Filed June 30, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-07-01408-CR

**RODNEY LAMONT HUNT, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 86th District Court**
**Kaufman County, Texas**
**Trial Court Cause No. 24858-86**

## MEMORANDUM OPINION

Before Justices Bridges, Myers, and Richter[1]
Opinion by Justice Bridges

Rodney Hunt appeals his murder conviction. A jury convicted appellant and sentenced him to ninety-nine years' confinement and a $10,000 fine. In three issues, appellant argues his confession was not corroborated by independent evidence; his first confession was obtained illegally, thereby tainting his second confession; and the trial court erred in denying his motion to suppress his confession. On original submission, we rejected appellant's argument that police used a "question first and warn later" technique and concluded appellant's post-*Miranda* statement was not tainted by a statement he gave to police before being given *Miranda* warnings. Following appellant's petition for discretionary review, the Court of Criminal Appeals vacated our judgment and remanded for us to consider the effect of *Martinez v. State*, 272 S.W.3d 615

---

[1] The Hon. Martin Richter, Justice, Assigned

(Tex. Crim. App. 2008) and *Carter v. State*, 309 S.W.3d 31 (Tex. Crim. App. 2010) on our reasoning and analysis in this case. We concluded neither *Martinez* nor *Carter* changed our disposition of this case. Appellant again filed a petition for discretionary review, and the Court of Criminal Appeals reversed our judgment and remanded for us to abate the appeal and order further findings of fact from the trial court. The trial court has now filed its supplemental findings of fact. The sole issue now is, in light of the trial court's supplemental findings, whether police in this case used a deliberate two-step interrogation technique to circumvent *Miranda* to obtain a second confession. We affirm the trial court's judgment.

Kaufman police officer Daniel Carrier was on duty July 27, 2006 near midnight when he heard a voice he recognized as Kelley Osgan's coming from the back yard of appellant's house. Carrier had known appellant for eight years and had known Osgan even longer, and he knew their voices and faces. Carrier, parked on the street across from appellant's house, listened for about fifteen minutes as Osgan yelled "leave me alone" and "I just want to leave." Carrier heard appellant telling Osgan to calm down. The argument was "getting very loud," and Carrier drove into appellant's driveway, turned on his spotlight to light up appellant's back yard, and went into the back yard to talk to Osgan and appellant. Carrier asked what the problem was and why they were being so loud. Carrier knew Osgan's "other boyfriend was in jail," and he was surprised when Osgan said appellant was her boyfriend. Appellant said he wanted Osgan to go in the house, but she wanted to leave. Appellant's mother came outside and started screaming, "That bitch needs to go." Osgan then agreed to go in the house and go to bed. Osgan and appellant stopped arguing, and Osgan said she was afraid she was going to get kicked out of the house and she would not have been able to come back if she left. Osgan went inside the house with appellant, and Carrier went back across the street.

On August 9, 2006, Carrier was dispatched to an auto dealership to meet with a "subject [who] had information on a possible deceased body." Carrier met with Scottie Mitchell, who said he had information from a third party that "there was supposed to be a body on a concrete slab in a wooded area." Mitchell got in Carrier's patrol car and directed him to an area Carrier knew had a "high activity of drug use." Carrier and Mitchell walked around the area, and Carrier smelled a stench that he followed to a concrete slab inside a clump of trees. Carrier found a blue fiberglass "race car body," looked underneath, and saw "some hair." To the right, Carrier "could see fingers of a hand." Carrier immediately returned to his patrol car and called for the investigations division to come out to the scene. Carrier "started securing the crime scene" and stayed while other officers began their investigation. Carrier eventually saw the body which was "halfway unclothed" and "decomposed." Five minutes after seeing the body's clothes, Carrier recognized them as Osgan's. Fingerprints taken from the body confirmed it was Osgan.

Tim Moore, a crime scene investigator with the Kaufman County Sheriff's office, arrived at the scene and saw the body before anything was moved. Moore saw what appeared to be a "go-cart body" with legs coming out from underneath. Looking inside the go-cart body, Moore saw a beer bottle "propped up" in the body's "genital area." Moore took photographs as the investigation progressed. Moore saw a "piece of concrete over the head area of the body" and saw the body's shirt was "pulled up above the breast line" and her pants were "pulled down near her knees." Moore was later able to compare a fingerprint from the body to Osgan's fingerprints and confirm her identity.

Edward Black, a criminal investigator with the Kaufman County police department, arrived at the crime scene and "had an idea" it was Osgan. Based on his experience, Black believed Osgan had not been murdered by a stranger because her face was covered. Later that day, another detective took a statement from a Dollar Store clerk that appellant and Osgan were

romantically involved. Black asked some of his patrol officers to look for appellant and tell him Black wanted to speak to him. One of the officers located appellant, told him Black wanted to talk to him, and gave appellant a ride to the police station. Appellant came in to talk to Black voluntarily and was not in custody. Appellant was a "person of interest" but Black had "nothing concrete at this point." Black asked appellant about his relationship with Osgan, but instead of answering, appellant "just started talking about [sic] I didn't have anything to do with that girl getting hurt." Black asked when was the last time appellant had seen Osgan. Appellant stated he last saw her on "the last day of last month." Based on the Dollar Store clerk's statement, Black knew appellant was lying about the last time he saw Osgan. Black told appellant he needed to schedule a more formal interview with appellant and they agreed to an interview and polygraph test on August 16. Appellant was cooperative and said he would come in to an interview and take a polygraph[2] test at the Mesquite police department. Black asked if appellant had a way to get to the interview because he knew appellant did not have a car. Appellant said he did not have a ride, so Black offered to take appellant to Mesquite, and appellant agreed.

When Black, accompanied by Texas Ranger Richard Shing, went to pick up appellant, appellant had a can of beer in a paper sack. Black put the beer in his trunk and planned to give it back to appellant when he left. At the Mesquite police station following the polygraph, Black and Shing talked to appellant for a little more than an hour. Appellant was not forthcoming initially, but as the interview progressed he became very emotional and started crying when Black showed appellant a living photo of Osgan. Black said he would tell the district attorney's office that appellant had cooperated, but he did not promise appellant anything "as far as specific outcomes." At the conclusion of the interview in Mesquite, Black asked appellant to come back

---

[2] We note that references to a polygraph test or to its results, are inadmissible for all purposes. *Martinez*, 272 S.W.3d at 626.

to Kaufman and make a written statement. Appellant agreed and rode back to Kaufman with Black. During the ride back to Kaufman, they did not "talk at all about the facts of this case."

When they got back to Kaufman, appellant wanted to smoke. Black had not arrested appellant and had not placed him in custody. Black let appellant go outside to have a cigarette. An officer came in to tell Black appellant was "having a seizure," and Black made sure an ambulance was called and went outside. Jarrod List, an emergency medical technician, came and found appellant sitting in a chair and "in no distress." Appellant stated he was "fine, just really nervous because he was confessing to murder." Appellant's vital signs were within normal limits, and he did not want further treatment or to be transported to the hospital. Black "allowed [appellant] time to cool off" and Ranger Shing asked if appellant wanted a cheeseburger, but appellant did not want to eat. Black asked appellant if he was sure he did not want to go to the hospital and if he wanted to go home or finish talking to Black. Appellant said he would talk to Black.

Black took appellant into the police chief's office for the interview because he "wanted something more comfortable." When the interview started, Black went through each of appellant's *Miranda* rights. Appellant said he understood his rights but wanted to talk to Black. Appellant initialed each paragraph of his written rights and wrote that he understood his rights but wanted to talk to police. Appellant's writing was shaky, which Black attributed to appellant withdrawing from alcohol. Appellant gave a statement, which Black wrote down. Appellant stated that, on Friday August 4, 2006, he went with Osgan to "the trails" to drink some beer. They were "talking good at first and then we started arguing." Appellant and Osgan started fighting and slapping each other. Appellant hit Osgan "four times and she fell down and I jumped on her and I hit her about five or eight, between five and eight times in the face." While appellant was hitting her, Osgan was "mumbling and moving a little bit." Appellant "covered

her up and I left." Appellant "didn't go back to where Kelley's body was after that" and he "knew she was dead when I left her." Appellant was subsequently indicted for Osgan's murder.

At trial, Amy Gruszecki, a medical examiner at the Dallas County Medical Examiners office, testified she performed an autopsy on Osgan's body. Gruszecki found what appeared to be an injury from a blunt force on Osgan's head, but the body was too badly decomposed to be certain. Similarly, the state of the body's decomposition prevented Gruszecki from determining whether there had been any hemorrhage in Osgan's brain. The "bone in the neck that breaks if somebody is choked or strangled" was missing. Gruszecki was also not able to make a finding regarding sexual assault because of the decomposition. Gruszecki testified Osgan's state of decomposition was consistent with her dying on August 4 and being found on August 9. Based on her examination of Osgan's body and the circumstances in which Osgan was found, Gruszecki concluded Osgan died as a result of homicidal violence. Asked about the absence of skull fractures, Gruszecki testified "you don't have to have a skull fracture to have brain injury."

Stefani Sylva, a clerk in the Kaufman Dollar Store, testified she saw appellant and Osgan in the store daily. At the store, appellant "took out the trash a lot" and "swept a lot." On July 27, 2006, appellant came in the store and bought a "love card" and a stuffed tiger. When asked, appellant said the card was for Osgan. Appellant borrowed a pen from Sylva and wrote SWAK on the envelope. Sylva asked what that meant, and appellant told her it meant "sealed with a kiss." On July 31 or August 1, Osgan came in the store and appeared "a little nervous" and "high-strung." Osgan asked Sylva if she had seen appellant and seemed "like she was looking for [appellant] for a reason." Sylva testified she was "not really sure" if that was the same day she saw Osgan shoplift an item and asked Osgan to put the item back. Sylva testified "we were fine about it and she left." Sylva did not see Osgan again.

On Friday, August 4, 2006, appellant came in the store and asked to borrow money from Sylva so he could take the bus to Huntsville to see his sister. Appellant seemed "upset" and said he had an argument with his mother and "needed to get the hell out of here." This "seemed strange" to Sylva and did not make sense to her because she did not understand appellant wanting to leave town over a fight with his mother. Appellant had "probably argued with his mother before, and had been to the store." Sylva knew appellant loved his mother because "he talked about his mom all the time." On Monday, August 7, appellant returned to the store. Appellant was wearing one shoe and a sock and said he had hurt his foot. Sylva asked how appellant had hurt his foot, and he said "running from [Osgan]. They were – running– he was running from her or running after her." On August 9, appellant said "they had found [Osgan] that morning" and "they found her – he just said they found her with something – on a tire or something on her head or something." Appellant said "he had nothing to do with it." Appellant said he had seen Osgan on Friday, and she wanted to go to Terrell, but appellant did not want her to go. Sylva thought "that caused an argument between the two because he didn't want her going to Terrell."

Patty Sosa testified she knew appellant "all [her] life" and met Osgan when Osgan was twenty-one. On August 10, 2006, police interviewed Sosa. Three or four days before the interview, Sosa saw appellant, who asked Sosa if she had seen Osgan. Sosa said Osgan might be with another man. Appellant said, "that damn bitch, just wait until I see her." Appellant was "upset," and Sosa heard him say "she's going to be sorry." At trial, Sosa testified she had gone with another man and a woman to smoke crack at the place where Osgan's body was and had seen "the little shoes" but did not see Osgan's body. When Sosa saw the shoes, she thought "somebody got high and left their little shoes," she reached down toward the shoes, and "the smell was so strong it threw me." Sosa and the woman she was with started screaming and "ran

out." Sosa did not report the incident to police because she "knew [she] had warrants," and she maintained she did not know it was a body or she would have reported it.

Appellant testified he met Osgan through a friend of his. Osgan and appellant "were friends," and this led to a boyfriend/girlfriend relationship. At some point, appellant learned Osgan was missing. Appellant testified that "Friday morning" he saw Osgan, and she said she was going to Terrell. Three or four days passed, and appellant began asking people if they had seen Osgan, but no one had seen her. Appellant testified he bought a "love card" and a toy bear for Osgan and he thought he was in love with her "a little bit." Appellant and Osgan had a boyfriend/girlfriend relationship for almost a month. Appellant was looking for Osgan when a friend of his told him the police "might be talking to" him because Osgan was missing. When shown a copy of his written statement, appellant did not remember signing it and said "that looks like some Egyptian writing." When asked how he was feeling on the videotape of his interview with Black, appellant testified he had syphilis and alcohol withdrawal and "had the shakes." Appellant denied injuring Osgan and said he signed "those papers" because he was "sick" and "scared." A jury convicted appellant of murdering Osgan.

As discussed above, the trial court has now filed supplemental findings of fact in which it found:

1. In regard to the "deliberateness" or "question-first, warn-later" technique contemplated in Missouri v. Seibert, this Court finds that the officers did not deliberately violate the defendant's Fifth Amendment rights in this case.
2. This Court finds that the officers did not intend to take the defendant into custody before or during the Mesquite interview subsequent to the polygraph examination (the first statement).
3. This Court finds that the defendant agreed to meet with the officers at the Mesquite Police Station for an interview, and that the officers drove the defendant to Mesquite and back to Kaufman on the occasion of the polygraph examination because the defendant had no other transportation.
4. This Court finds that although Ranger Shing's statement to the defendant about not "going home" on a lie could have led the defendant to believe he was not free to leave, there is no evidence in this record that the Ranger had the subjective intent to place the defendant in custody or to cause the defendant to believe that he was in custody.

5. The Court finds that the defendant was advised prior to giving that statement that he could go to the hospital for medical treatment and that he was given the option of going home. The Court finds that the defendant voluntarily consented to give the second statement at the Kaufman Police Department.
6. The Court is familiar with witness Edward Black; the Court finds that Detective Black was a credible witness and that his testimony was worthy of belief. The Court finds that Detective Black did not intend to place the defendant in custody prior to taking his second statement in Kaufman.
7. The Court finds that the paramedic Jarrod List testified that he responded to treat the defendant at the Kaufman Police Department before the defendant gave his statement to police and that the defendant told him that he was just "really nervous because he was confessing to murder." List testified that the defendant did not want to be transported to the hospital.
8. The Court finds that the officers did not deliberately attempt to avoid the requirements of *Miranda* and Article 38.22 when they questioned the defendant in Mesquite after his failed polygraph examination; the Court further finds that the officers were simply mistaken in believing that the defendant was never in custody or otherwise restrained of his liberty while in Mesquite.
9. This Court finds, based upon the record, that the defendant was not in custody at the time he consented to give the written and recorded statement at the Kaufman Police Department (the second statement).
10. The Court finds that the defendant's statements at the Kaufman Police Department were voluntarily made after he knowingly waived his rights under Miranda and Article 38.22. The Court finds, in any event, that the defendant's statements at the Kaufman Police Department were admissible because at that time the defendant was clearly NOT in custody or under arrest, and the interview at the Kaufman Police Department was therefore not a custodial interview.

Appellant argues police in this case used a deliberate two-step interrogation technique to circumvent *Miranda* to obtain a second confession. Appellant argues that police employed this deliberate two-step questioning strategy to circumvent *Miranda* and then failed to take curative measures to ensure that appellant would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.

A deliberate two-step questioning strategy is also known as a "question first and warn later" technique. The U.S. Supreme Court disapproved of such tactics in *Missouri v. Seibert*, 542 U.S. 600 (2004). It specifically determined the admissibility of statements made after the police give "midstream" warnings, that is, when police begin a custodial interrogation without advising

the suspect of his *Miranda* rights, obtain incriminating statements, and then continue questioning after administering warnings in order to re-elicit the incriminating statements. *Id*.

Whether the two-step questioning strategy was deliberate hinges on the interrogating officer's subjective intent. *Carter*, 309 S.W.3d at 39. When the officer testifies at a hearing on a motion to suppress, the officer's demeanor and testimonial evidence "are especially relevant to a deliberateness determination." *Id.* at 40. Thus, when the trial court, after having the chance to observe the officer's testimonial evidence and demeanor, has made an explicit factual finding regarding the deliberateness of the strategy, a reviewing court must employ a deferential standard of review and may reverse only upon a showing of abuse of discretion. *Id.* at 40-42. Once a determination has been made that the pre-warning questioning was not part of a deliberate plan to undermine a suspect's *Miranda* protections, it is still necessary to determine if appellant's post-warning statements were voluntarily made. *Id.* at 41.

Because both *Martinez* and *Carter* deal with issues relevant to our analysis, we discuss each in turn. In *Martinez*, police arrested Martinez but did not give him *Miranda* warnings. *Martinez*, 272 S.W.3d at 618. At police headquarters, officers questioned Martinez, who denied knowing about the underlying robbery and murder. *Id.* Officers took Martinez to a police polygrapher who spent three to four hours administering a polygraph test to Martinez. *Id.* Officers again took Martinez into custody, informed him he had failed the polygraph test, and took him to municipal court where a magistrate gave appellant *Miranda* and other statutory warnings for the first time. Upon Martinez's "prompt return" to the central holding station, officers again questioned Martinez about the robbery and murder. *Id.* Officers repeated the *Miranda* warnings, and Martinez gave a videotaped statement regarding the incident. *Id.* During the videotaped statement, Martinez stated he was only a "lookout" person and was not one of the assailants who robbed and shot the victims. *Id.*

In concluding Martinez's videotaped statement was inadmissible, the court of criminal appeals first concluded a "deliberate two-step strategy" had been used because Martinez was not given *Miranda* warnings at the time he was arrested for capital murder; officers questioned him about the crime without giving the required warnings; Martinez was not given *Miranda* warnings before being taken for a polygraph examination; the absence of *Miranda* warnings at the beginning of the interrogation process was not a mistake based on the interrogating officers' mistaken belief that Martinez was not in custody, but rather a conscious choice; Martinez was in the continuous presence of police personnel; and officers did not inform Martinez during the videotaped interview that, based on the lack of *Miranda* warnings, any statement made during the initial interrogation, including the polygraph exam, could not be used against him. *Id.* at 622-26. The court, after finding the absence of *Miranda* warnings at the beginning of the interrogation process was not a mistake, stated if the deliberate two-step strategy has been used, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id*. at 26 (quoting *Missouri v. Seibert*, 542 U.S. 600, 621 (2004) (Kennedy, J., concurring)). The court concluded officers failed to apply any curative measures in order to ameliorate the harm caused by the *Miranda* violation. Thus, the court reasoned, Martinez's videotaped statement was inadmissible, and the court remanded the cause to the court of appeals for a harm analysis. *Id.*

In *Carter*, police stopped a rental car in which Carter was a passenger and arrested Carter and the driver when a consent search revealed packages of cocaine hidden underneath the back seat. *Carter*, 309 S.W.3d at 33. On the way to the police station, appellant made incriminating statements about the offense in response to officer's questioning. *Id.* Carter filed a motion to suppress, arguing his statements were obtained in violation of his *Miranda* rights. The trial court denied Carter's motion to suppress based on the officer's testimony that Carter was advised of

his *Miranda* rights before he was questioned. However, at trial, the onboard videotape of Carter's arrest showed he was arrested, handcuffed, placed in the police car, asked whether the substance was cocaine or crack cocaine, and answered that it was cocaine before receiving *Miranda* warnings. *Id.* Carter objected to these statements on the ground that he was in custody and had not yet received *Miranda* warnings. *Id.* The trial court sustained the objection and instructed the jury to disregard Carter's statements but denied Carter's motion for mistrial. *Id.* Carter then objected to the admission of any further statements made after he had been given Miranda warnings, but the trial court overruled his objection and admitted Carter's admissions that the cocaine belonged to him and the driver, they had picked it up in Phoenix, they paid $8000 for it, and they expected to turn a big profit selling it. *Id.* at 33-34. The jury convicted Carter of possession with intent to deliver a controlled substance.

On appeal, Carter raised the issue of whether the trial court erred in admitting his post-*Miranda* statements. *Id.* at 34. The court of appeals abated the case for the trial judge to make findings regarding the voluntariness of Carter's statements. *Id.* The trial court entered findings that: Carter freely and voluntarily confessed orally on videotape; police made no deliberate attempt to avoid the requirements of *Miranda* by questioning Carter after his arrest but before he was warned, and the failure to warn before those questions was simply an oversight; police did not deliberately employ a two-step questioning technique in violation of *Miranda*; and the *Miranda* warnings Carter received were effective because there was no carryover taint beyond the two unwarned admissions, and the warnings came at a time when Carter could still make a knowing, free, and voluntary choice to make the further admissions that he did. *Id.* at 34-35.

The court of appeals, reviewing the case again after remand, concluded the facts were uncontroverted and therefore reviewed the trial court's ruling de novo. *Id.* at 35. Based on its assessment of the facts, the court of appeals held that the officer's two-step approach was a

conscious choice, calculated to undermine Carter's *Miranda* rights, the officer did not administer any curative measures, and the unwarned and warned statements were made during an undifferentiated single event. *Id.* Thus, the court of appeals held the trial court erred in denying Carter's motion to suppress, and the error was not harmless beyond a reasonable doubt. *Id.*

On discretionary review, the court of criminal appeals noted the applicable standard of review does not permit a reviewing court to reverse a trial court's finding of fact simply because it would have decided the question differently. Applying "the appropriately deferential standard of review," the court concluded the record supported the trial judge's finding that the officer's pre-*Miranda* questioning was not a deliberate attempt to avoid the requirements of *Miranda*. *Id.* at 41. The court turned to an analysis of whether Carter's post-warning statements were voluntarily made. *Id.* Emphasizing that the trial court is the sole and exclusive trier of fact and judge of the credibility of the witnesses, particularly when a motion to suppress is based on the voluntariness of a confession, the court concluded the record and reasonable inferences from the record supported the trial court's finding that Carter's post-*Miranda* statements to the officer were knowingly and voluntarily made. *Id.* at 41-42. Based on this reasoning, the court agreed with the trial judge that appellant's post-warning statements were admissible. *Id.* at 42. Concluding the trial judge did not err in denying Carter's motion to suppress, the court reversed the judgment of the court of appeals and remanded the case to that court to address Carter's remaining issue. *Id.*

Here, the trial court found, in regard to the "deliberateness" or "question-first, warn-later" technique contemplated in *Missouri v. Seibert*, that the officers did not deliberately violate appellant's Fifth Amendment rights in this case. The officers did not intend to take appellant into custody before or during the Mesquite interview subsequent to the polygraph examination. The officers did not deliberately attempt to avoid the requirements of *Miranda* and Article 38.22

when they questioned the defendant in Mesquite after his failed polygraph examination; the officers were simply mistaken in believing that appellant was never in custody or otherwise restrained of his liberty while in Mesquite. *Cf. Martinez*, 272 S.W.3d at 624 (absence of *Miranda* warnings at beginning of interrogation after appellant's arrest were not a mistake based on interrogating officers' mistaken belief appellant not in custody, but rather a conscious choice). Applying the "appropriately deferential standard of review," we conclude the record supports the trial court's finding that the officer's pre-*Miranda* questioning was not a deliberate attempt to avoid the requirements of *Miranda*. *Carter*, 309 S.W.3d at 41.

Once a determination has been made that the pre-warning questioning was not part of a deliberate plan to undermine a suspect's *Miranda* protections, it is still necessary to determine if appellant's post-warning statements were voluntarily made. *Id.* The factfinder must examine all of the circumstances and the course of police conduct in evaluating the voluntariness of those post-*Miranda* statements. *Id.* (citing *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)).

As to the voluntariness of appellant's statement in Kaufman, the trial court found appellant was advised prior to giving that statement that he could go to the hospital for medical treatment and that he was given the option of going home. The trial court found appellant voluntarily consented to give the second statement at the Kaufman Police Department. Appellant's statements at the Kaufman Police Department were voluntarily made after he knowingly waived his rights under Miranda and Article 38.22.

In its original findings, the trial court found the custodial interrogation without proper *Miranda* warnings in Mesquite did not taint the second confession in the Kaufman police station. In support of this conclusion, the trial judge found appellant was taken from Mesquite to Kaufman, a twenty-five mile drive that would take approximately thirty-one minutes. In addition, the trial court found there was no evidence "as to weather or traffic conditions or the

time it took for paramedics to arrive and examine appellant." Appellant told "the medic that he was about to confess to murder," indicating appellant "did not consider that he had already confessed." The trial court found police offered to take appellant home, but appellant said he "wants to get things over with."

At the Kaufman police station, appellant was properly given his *Miranda* warnings, and the warnings appear on the confession he later signed. Appellant initially refused to confess but eventually confessed to murdering Osgan, with substantial changes from his previous statements. Appellant refuted in Kaufman some of the things he said in Mesquite, such as his statement in Mesquite that he had gone back to cover up Osgan's body further the day after the murder. Appellant also refused to say in Kaufman he had placed a piece of concrete on the body. Thus, the trial judge found appellant was "perfectly able to ward off things said in Mesquite that he [didn't] want to say in Kaufman."

Our review of the record and reasonable inferences from the record shows that the record supports the trial court's findings that appellant's post-*Miranda* statements were voluntary. *See id.* at 41. In cases like this, a subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. *Id.* at 42. Further, the record shows appellant had time to reflect on his decision to make a written statement in Kaufman during the drive from Mesquite and during the time he was being examined by paramedics and left to "cool off" following his seizure. At the police station in Kaufman, where appellant lived, Black allowed appellant to go outside and smoke by himself, and Black offered to let appellant go to the hospital or go home or finish talking to Black. Appellant chose to talk to Black. Appellant stated he wanted "to get things over with." Under the facts and circumstances of this case, we therefore conclude the trial court did not abuse its discretion in finding appellant's second

confession was not so tainted as to make it inadmissible.  *See Seibert*, 542 U.S. at 615; *Carter*,

309 S.W.3d at 41-42; *Martinez*, 272 S.W.3d at 622-27; *Herndon*, 215 S.W.3d at 905-06.

We affirm the trial court's judgment.


Do Not Publish
TEX. R. APP. P. 47
071408F.U05

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

RODNEY LAMONT HUNT, Appellant

No. 05-07-01408-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 86th District Court,
Kaufman County, Texas
Trial Court Cause No. 24858-86.
Opinion delivered by Justice Bridges.
Justices Myers and Richter participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered June 30, 2014