# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00196-CR

**Jeff Ellis Nanny, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
### NO. A-14-0353-SB, HONORABLE MARTIN (BROCK) JONES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Jeff Ellis Nanny was charged with "intentionally and knowingly possess[ing] a controlled substance, namely, methamphetamine, in an amount of less than one (1) gram." *See* Tex. Health & Safety Code §§ 481.102(6) (including methamphetamine within "Penalty Group 1"), .115(a) (providing that person commits offense if he "knowingly or intentionally possesses a controlled substance listed in Penalty Group 1"). Prior to trial, Nanny filed a motion to suppress evidence obtained from his residence, including items found on his kitchen counter, and to suppress evidence of statements that he made to the arresting officers. After conducting a hearing on the motion and considering the arguments made by both sides, the district court denied the motion to suppress. At the end of the trial, the district court found Nanny guilty and imposed a punishment of 600 days in jail. *See id.* § 481.115(b) (providing that offense is state-jail felony); Tex. Penal Code § 12.35 (setting out permissible punishment range for state-jail felony). In a single issue on appeal,

Nanny challenges the district court's ruling on his motion to suppress. We will affirm the district court's judgment of conviction.

## BACKGROUND

During the relevant time period, Nanny was living in an apartment behind his grandmother's house. The apartment was inside a larger structure that had two garage doors that were used for entering and exiting the building. To obtain access to the apartment, an individual would have to go into the building and then enter the apartment through an interior door located at the back of the building. The apartment was between ten and twelve feet long and had a bathroom directly in front of the entry door and a kitchenette on the right side. The kitchenette had a refrigerator on the wall farthest from the entryway and a counter that ran along the wall and ended at the refrigerator.

Because Nanny was a registered sex offender, police officers would routinely perform sex-offender-address verifications to make sure that he was actually living at the address on file. One police officer who performed these verifications was Officer Austin Graham Smith. After Officer Smith was unable to track down Nanny at his registered address early one evening, he decided to drive by Nanny's home later that same night and noticed that there were lights on in the home and that the garage doors were open. Officer Smith then entered the building, knocked on the door to the apartment, and interacted with Nanny.

What happened during Officer Smith's interaction with Nanny is disputed and forms the basis for this appeal, but what is not in dispute is that Nanny was arrested for possession of methamphetamine and that a bag of a white crystalline substance, among other items, was seized

from Nanny's home. Following his arrest, Nanny filed a motion to suppress arguing that evidence obtained from his home and evidence regarding statements that he made should be suppressed because there was no justification for the warrantless search. After the motion was filed, the district court conducted a suppression hearing. During the hearing, the following four witnesses were called to the stand: Dorothy Ann Brewer, who was Nanny's grandmother; Sheila Kay Brewer, who was Nanny's mother; Officer Smith; and Officer Gary Cole.

In her testimony, Dorothy explained that if the door to Nanny's apartment was closed, someone standing in the garage could not see inside the residence and that even if the door was open, a person standing in the garage could not see the kitchen counter. In addition, she related that in order to see what was on the counter, someone would have to be inside the apartment. Moreover, she mentioned that she is the owner of the apartment and that she did not give the officers permission to search inside the apartment. Similarly, Sheila testified that although "a very small part of th[e] counter shows" or is visible from the doorway, someone would not be able to see an item on the counter, particularly if there were people standing in front of the counter, "unless it was right over there on the edge, right next to the refrigerator." In addition, she explained that it would not be possible to see anything from the front door because Nanny's apartment was very messy.

During Officer Smith's testimony, he related that when he went to Nanny's home, the garage doors were open and that the door to Nanny's apartment was also "open . . . about a foot." In addition, he explained that he announced his presence; knocked on the door, which opened the door more; and noticed Nanny and another man standing at the counter approximately ten feet away. Further, he stated that after he knocked on the door, Nanny made some furtive gestures before both

of the men started walking towards him. Moreover, Officer Smith stated that after the men moved, he was able to see drug paraphernalia on the counter, including a spoon, small plastic bags, and an orange cap to a syringe. When describing why those items were paraphernalia, Officer Smith related that based on his training and experience small bags are used to "package small quantities of illegal narcotics" and that people use spoons to melt "illegal narcotics" and then use the spoon as a bowl from which to "draw the narcotics off" with a syringe. Further, he clarified that "[i]f you stand outside the doorway you can see directly to the kitchenette counter" and that he was "[a]bsolutely" able to see the paraphernalia while standing in the open doorway to the residence.

Next, Officer Smith testified that Nanny walked through the doorway, closed the door, and talked with the officer outside the home. Furthermore, Officer Smith recalled that Nanny provided "three different stories . . . about what was going on" in the house, that he asked Nanny for permission to go inside the home, that Nanny nodded his head in agreement, that Nanny knocked on his door and told the person inside to let him know if he was decent before opening the door, that Officer Smith thought it was suspicious that Nanny asked the man to let them know when he was decent because Officer Smith noticed that the other man was fully dressed when Officer Smith first saw him, and that Nanny "opened the door and we both walked in."

Regarding what happened after he went inside the home, Officer Smith testified that he saw in plain view on Nanny's bed a "[p]lastic bag containing a white crystal substance and a grinder which had [a] green leafy substance residue inside of it," that he did not have to move anything to see those items, and that he recognized them as contraband from his prior investigations and training. Officer Smith also explained that after observing the items on the bed, he put handcuffs

4

on both men, separated them, took Nanny outside, placed the other man in the police car, and called in a report regarding the events.

Then, Officer Smith related that Detective Cole arrived on the scene, that they read Nanny his *Miranda* rights, that they asked Nanny if he understood those rights, that Nanny nodded his head up and down in agreement, that they asked Nanny if they could go back inside the apartment, that Nanny consented to their going inside and entered the home with the officers, that they asked Nanny what the "tar-like" substance in the spoon "with burn marks" was, and that Nanny said "it was heroin" and "belonged to him." In addition, Officer Smith recalled that they seized the spoon as well as the bag containing the white crystals, which he recalled were both in plain view. During his testimony, Officer Smith admitted that he did not have a warrant to search the property, that there were no exigent or "emergency conditions" when he walked to the apartment, and that he was not concerned that either of the men might try to destroy the evidence.

After Officer Smith finished his testimony, Officer Cole was called to the stand. In his testimony, he explained that after he arrived at Nanny's residence, he asked Nanny if Nanny and the two officers could go inside and that Nanny replied, "okay," and "led the way first into the apartment." Next, Officer Cole recalled that he saw the white crystalline substance on Nanny's bed in plain view, that they removed the handcuffs from Nanny's wrists, that Officer Smith read Nanny his *Miranda* rights, that Nanny indicated in response to a question that he wanted to waive those rights by nodding his head up and down, that Officer Cole asked Nanny if he had any narcotics, that Nanny said that there might be some marijuana residue from when he had consumed marijuana earlier, that Officer Cole asked Nanny if he could look around the home, that Nanny gave his

consent, that Officer Cole visually scanned the room but did not move anything or open any drawers, that he saw the spoon and syringe cap, that he asked Nanny what they were being used for, and that Nanny said that he was using them to ingest heroin. Further, Officer Cole related that he seized the "white crystal-like substance that was in the bag on the bed" and that he weighed and "field tested" a sample of the substance. In addition, he recalled that based on the results of the testing, he informed Nanny that he was under arrest for possessing a controlled substance and that Nanny volunteered that the methamphetamine was his and not the other man's without being asked a question.

At the end of the suppression hearing, the district court ruled that the motion to suppress was denied as it pertained to the methamphetamine discovered on the bed and the items found on the counter. Further, the court ruled that Nanny's motion was also denied with respect to his statement that the methamphetamine was his. The district court did not issue any findings of fact or conclusions of law when it denied the motion to suppress.

## GOVERNING LAW AND STANDARD OF REVIEW

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)); *see also State v. Robinson*, 334 S.W.3d 776, 778 (Tex. Crim. App. 2011) (noting that appellate courts "view the evidence in the light most

favorable to the" trial court's ruling). Moreover, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). "The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). In general, courts "consider only the evidence adduced at the suppression hearing because the ruling was based on that evidence rather than evidence introduced later" unless "the suppression issue has been consensually relitigated by the parties during trial." *Herrera v. State*, 80 S.W.3d 283, 290-91 (Tex. App.—Texarkana 2002, pet. ref'd) (on reh'g). "When the trial court does not file findings of fact concerning its ruling on a motion to suppress, we assume that the court made implicit findings that support its ruling, provided that those implied findings are supported by the record." *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). In addition, a trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory. *Story*, 445 S.W.3d at 732.

## DISCUSSION

In his sole issue on appeal, Nanny contends that the district "court abused its discretion by denying [his] Motion to Suppress and in admitting the statements and actions" made

7

by him during "the trial of the case." When presenting this issue on appeal, Nanny seems to argue that "[w]hat [Officer Smith] observed" while standing in the doorway "did not constitute an offense," but he also asserts that Officer Smith should have given Nanny *Miranda* warnings when he first observed the paraphernalia before he entered the apartment. In addition, Nanny contends that after Officer Smith entered the home and observed the white crystalline substance, Officer Smith placed him in custody without reading him his *Miranda* warnings. Further, he notes that no *Miranda* warnings were given until after Officer Cole arrived. In light of the fact that no *Miranda* warnings were given until after Officer Cole arrived, Nanny urges that this case involves "a two-step interrogation," that "curative measures should [have been] taken to ensure that a reasonable person in [his] position would [have understood] the import and effect of the Miranda warning and waiver," and that those curative measures "should have been take[n] prior to the second entry into the apartment and the securing of [his] statement . . . that the methamphetamine was his."

When presenting this issue on appeal, Nanny principally relies on *Martinez v. State*, 272 S.W.3d 615 (Tex. Crim. App. 2008), as support for the idea that some type of curative measures should have been taken in this case. In *Martinez*, Martinez was arrested "in a convenience-store parking lot," but the police did not read him his *Miranda* rights at the time of the arrest. *Id.* at 617-18. Further, Martinez was questioned by police officers at "police headquarters," was given a polygraph examination, and was told that he failed the exam all without being read his *Miranda* rights, and Martinez was not informed of those rights until he was brought before a magistrate. *Id.* at 618. After Martinez appeared before the magistrate, the investigating officers "repeated the *Miranda* warnings" before questioning Martinez again about the alleged "robbery and murder," and

8

Martinez "gave a videotaped statement regarding the incident" and stated on the recording "that he had become aware of certain facts about the crime through the polygraph examiner." *Id.* Martinez moved "to suppress the videotaped statement because he had not received *Miranda* warnings when he was arrested or before the polygraph examination." *Id.*

When addressing whether Martinez's statement should have been suppressed, the court of criminal appeals thoroughly discussed a case by the Supreme Court and referred to both the plurality opinion and one of the concurring opinions in that case. *See id.* at 619-21. Specifically, the court of criminal appeals examined *Missouri v. Seibert*, 542 U.S. 600 (2004), in which Seibert gave a confession after she was arrested but before she was given *Miranda* warnings and in which the police officer returned twenty minutes later, read Seibert her *Miranda* rights, obtained a signed waiver of those rights, and recorded another confession from Seibert. *Id.* at 605. When determining that the warned confession was inadmissible, the plurality explained that "it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing a suspect for successive interrogation, close in time and similar in content," that the "manifest purpose" of "question-first is" "to get a confession the suspect would not make if he understood his rights at the outset," and that "[w]hen *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead" a defendant and deprive him of the ability to truly understand his rights and the consequences of abandoning his rights. *Id.* at 613-14. Further, the plurality reasoned that a determination regarding the effectiveness of "*Miranda* warnings delivered midstream" should consider "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the

9

continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. In contrast, the concurring opinion urged the use of a "narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring). In other words, the concurring opinion urged that a statement made after *Miranda* rights were given and waived "that are related to the substance of prewarning statements" should only be excluded if the evidence shows that the police attempted to undermine the protections of *Miranda* by "deliberate[ly using a] two-step strategy . . . unless curative measures are taken before the postwarning statement is made" and that those measures "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.*

Agreeing with the analysis from the concurring opinion, the court of criminal appeals in *Martinez* determined that the police used a two-step-interrogation technique "'in a calculated way to undermine the *Miranda* warning'" based on the following undisputed facts:

> (1) appellant was in custody and under arrest for capital murder; (2) Officer Sosa did not give appellant *Miranda* warnings at the time of his arrest; (3) Officers Sosa and Hernandez questioned appellant about the crime at the police station without giving the required warnings; (4) appellant did not receive *Miranda* warnings before being taken for a polygraph examination; ([5]) the identity of the polygrapher and the polygraph-examination questions are not included in the trial or appellate record; and (6) a magistrate read the *Miranda* warnings to appellant only after both the first round of interrogation and the polygraph examination.

272 S.W.3d at 622-23 (internal footnotes omitted) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring)). Further, the court observed that Martinez "gave both" the pre-warning and post-warning

"statements to law-enforcement officials after his formal arrest pursuant to an arrest warrant, and both statements were given at a police station." *Id.* at 624. Accordingly, the court commented that "the absence of *Miranda* warnings at the beginning of the interrogation process was not a mistake based on the interrogating officers' mistaken belief that appellant was not in custody, but rather a conscious choice." *Id.* Further, the court noted that the record showed that there was no substantial break in time between when those statements were given and that Martinez was in "the presence of police personnel" without interruption between the statements. *Id.* at 625. Moreover, the court observed that the police acted as if the second interrogation was a continuation of the first one by referring to the previous interrogation and restating what had been discussed "during the first interview." *Id.* In addition, the court explained that the police failed to inform Martinez "that, based on the lack of *Miranda* warnings, any prior statement made during a previous interrogation, including the polygraph exam, could be not used against him." *Id.* at 626. Finally, the court stated that no curative steps were taken to ensure that a reasonable person in Martinez's position could understand the importance of the *Miranda* warning and of the waiver of the rights in the warning and provided the following non-exhaustive list of curative steps that can be taken:

> (1) a substantial break in time and circumstances between the unwarned statement and the *Miranda* warning . . . ; (2) explaining to the defendant that the unwarned statements, taken while in custody, are likely inadmissible . . . ; (3) informing the suspect that, although he previously gave incriminating information, he is not obligated to repeat it . . . ; (4) the interrogating officers refrain from referring to the unwarned statement unless the defendant refers to it first . . . ; or (5) if the defendant does refer to the *pre-Miranda* statement, the interrogating officer states that the defendant is not obligated to discuss the content of the first statement.

*Id.* at 626-27 (internal footnotes omitted).

11

In light of the case law discussed above, Nanny contends that a curative step needed to be taken before the evidence pertaining to the items seized from his home and pertaining to the incriminating statements that he made could properly be admitted and that in the absence of some curative step, the district court abused its discretion by denying his motion to suppress. However, it appears from the record that Nanny did not present these arguments in his motion to suppress or during the suppression hearing. Instead, he asserted that the items seized and statements that he made were obtained through a warrantless search and that the warrantless search was not justified because there were no exigent circumstances, because he did not give the officers consent to search his home, and because the items seized from the counter could not have been seen from the doorway. *See* Tex. R. App. P. 33.1(a) (stating that to preserve error for appeal, record must show that complaint was made to trial court and that trial court ruled on request or refused to rule and that "complaining party objected to the refusal"); *Rothstein v. State*, 267 S.W.3d 366, 373-74 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (determining that defendant did not preserve issue for appeal where his argument did not comport with objection raised in motion to suppress or at suppression hearing).

Assuming for the sake of argument that this issue is properly before this Court, we believe that Nanny's reliance on *Martinez* is misplaced. In *Martinez* and in the cases that *Martinez* relies on, the police questioned the defendant regarding the criminal allegations, and the defendant provided answers to those questions before the defendant was *Mirandized*. In this case, however, the testimony produced during the suppression hearing demonstrated that Nanny's statements pertaining to possession of a controlled substance were made after Nanny had been read his

*Miranda* rights and after he indicated that he wanted to waive them. *See North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979) (recognizing that waiver of right to remain silent may be inferred from actions of defendant and that "an explicit statement of waiver is not invariably necessary"). In other words, there were no pre-warned inculpatory statements made by Nanny. Moreover, according to the uncontested testimony produced during the hearing, Nanny's statement admitting that the methamphetamine belonged to him was not made in response to any question posed by the officers.

In addition to arguing that his statement should have been suppressed because the officers failed to take some type of curative action after initiating what he characterizes as a two-step interrogation, Nanny contends that the protections outlined in *Martinez* should also be applied to exclude the physical evidence seized from his home. However, we can find nothing in *Martinez* that leads us to conclude that the analysis from that case or its holding has any bearing on the seizure of physical evidence. On the contrary, the entire import of *Martinez* and the cases upon which it relies is aimed at ensuring that an accused's *Miranda* rights to remain silent, to be told that anything he says can be used against him, and to have an attorney present are not undermined through improper questioning. *See Martinez*, 272 S.W.3d at 623; *see also Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) (requiring that accused be informed when taken into custody and before he is questioned that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires").

To the extent that Nanny is asserting on appeal that the district court should have suppressed the evidence because it was improperly obtained by a warrantless search, we cannot agree

13

with his assertion that the district court's ruling was an abuse of its discretion. When seeking to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment, a defendant has the initial burden of rebutting "the presumption of proper police conduct," but if the defendant meets this burden by showing that the search was done "'without a warrant,'" the State has the burden of proving that the search "was nonetheless reasonable under the totality of the circumstances." *Amador v. State*, 221 S.W.3d 666, 672-73 (Tex. Crim. App. 2007) (quoting *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986), *disapproved of on other grounds by Handy v. State*, 189 S.W.3d 296, 299 n.2 (Tex. Crim. App. 2006)). Moreover, appellate courts review "a trial court's application of the law of search and seizure to the facts *de novo*." *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

If police officers enter a home, that is a "'search'" for Fourth Amendment purposes. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011); *Valtierra*, 310 S.W.3d at 448. If the police do not have a warrant for entering and searching a residence, the search is presumed unreasonable unless one of the well-defined exceptions applies. *Limon*, 340 S.W.3d at 756; *Valtierra*, 310 S.W.3d at 448. One of those exceptions applies when the search was obtained through voluntary consent. *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990); *Limon*, 340 S.W.3d at 756. In other words, voluntary consent by the owner or occupant makes the entry into the home constitutionally "'reasonable.'" *Valtierra*, 310 S.W.3d at 448.

Consent may be given by the owner or occupant orally or through actions and may be proven with circumstantial evidence. *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011); *Valtierra*, 310 S.W.3d at 448. The validity of the consent is a fact question that is determined

14

by considering the totality of the circumstances, *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Weaver*, 349 S.W.3d at 526, and the State must prove that the consent was voluntary by clear and convincing evidence, *Weaver*, 349 S.W.3d at 526; *Valtierra*, 310 S.W.3d at 448. However, consent to enter the home does not on its own authorize the police to search the entire home or objects located inside the home. *Valtierra*, 310 S.W.3d at 448. A search's scope is usually bounded by its expressed object. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Weaver*, 349 S.W.3d at 526. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251.

Another exception to the warrant requirement occurs when the search involves the seizure of items that are in plain view. *See Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). In other words, an officer may "seize an item during a warrantless search if (1) the officer sees an item in plain view at a vantage point where he has the right to be, and (2) it is immediately apparent that the item seized constitutes evidence—that is, there is probable cause to associate the item with criminal activity." *State v. Elrod*, 395 S.W.3d 869, 879 (Tex. App.—Austin 2013, no pet.). When an officer observes contraband "'from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point.'" *Walter v. State*, 28 S.W.3d 538, 541-42 (Tex. Crim. App. 2000) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)); *see Horton v. California*, 496 U.S. 128, 133 (1990) (stating that if object is in plain view, neither its observation nor its seizure involves any

15

invasion of privacy); *see also State v. Dobbs*, 323 S.W.3d 184, 188 n.11 (Tex. Crim. App. 2010) (providing that "[a]n investigation that does not impinge upon a defendant's legitimate privacy or possessory interest does not implicate Fourth Amendment protections"). Provided that the "officer is legitimately on the private premises, . . . he may seize any item in plain view that probable cause tells him is contraband." *Elrod*, 395 S.W.3d at 879-80.

Probable cause exists when "the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). "The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer." *Id.* (internal citations omitted); *see also Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) (explaining that piecemeal consideration of evidence is prohibited). Those circumstances include "the training, knowledge, and experience of law enforcement officials." *Wiede*, 214 S.W.3d at 25; *see also Brinegar v. United States*, 338 U.S. 160, 175 (1949) (explaining that probable cause requires evidence that amounts to "more than bare suspicion" but less than necessary for conviction).

As an initial matter, we note that although Dorothy and Sheila testified that someone standing in the doorway of the apartment could not see items that were located on the kitchen counter, Shiela also testified that a small portion of the counter could be seen from the doorway.[1]

---

[1] During the hearing, a photograph taken from the doorway of the apartment was admitted into the record. The photograph seems to show that a portion of the kitchen counter could be seen from the doorway.

Moreover, Officer Smith testified that he could clearly see paraphernalia on the counter while he was standing in the doorway, and the district court could have resolved that dispute in favor of Officer Smith by crediting his testimony. *See Crain*, 315 S.W.3d at 48. In addition, Officer Smith's testimony that he observed a syringe cap, spoon, and small plastic bags along with his testimony establishing that he believed that those items were drug paraphernalia based on his training and experience would support the district court's implied determination that Officer Smith had probable cause to associate those items with criminal activity and to seize those items. *See Rios v. State*, No. 04-14-00653-CR, 2015 WL 3505021, at *2 (Tex. App.—San Antonio June 3, 2015, no pet.) (mem. op., not designated for publication) (determining that district court did not abuse its discretion in denying motion to suppress because officer had "probable cause to associate the syringe seen in plain view with criminal activity" and, accordingly, could properly "seize the syringe under the 'plain view' doctrine"); *see also Lopez v. State*, 223 S.W.3d 408, 417 (Tex. App.—Amarillo 2006, no pet.) (noting that "certain objects not inherently suspicious can become so under certain circumstances"); *Vercher v. State*, 861 S.W.2d 68, 70-71 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (explaining that officer could rely on training and experience to distinguish crack pipe from other lawful tools even without examining object more closely).

Even assuming for the sake of argument that Officer Smith was unable to see the items on the counter when he announced his presence, Officer Smith provided uncontradicted testimony establishing that after knocking on the door and after talking with Nanny outside the apartment, he asked Nanny for permission to enter the home and that Nanny agreed to the request by nodding his head and by opening the door and letting Officer Smith inside. *See Valtierra*,

17

310 S.W.3d at 448 (explaining that consent to search "may be given orally or by action, or shown by circumstantial evidence"); *Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (stating that consent to enter home could be inferred from defendant's action of motioning officer to come forward and enter home). In addition, Officer Smith related that Nanny behaved in a suspicious manner by delaying opening the door long enough to ask the other man if he was decent before opening the door even though Officer Smith previously observed that the man was fully clothed. Moreover, Officer Smith testified that once he entered the home, he was able to see in plain view a white crystalline substance and a grinder and that he recognized them as contraband based on his training and experience. Further, Officer Smith and Officer Cole both testified that Nanny later gave his consent for the officers to enter the home again, and Officer Cole clarified that Nanny answered, "okay," when the officers asked if they could enter the home and then led the officers into the home. Also, Officer Cole stated that Nanny gave his consent for the officers to look around the home and recalled that he saw the syringe cap, the spoon, and the white crystalline substance in plain view, that he tested the crystalline substance, and that he placed Nanny under arrest for possession of methamphetamine after obtaining the results of the test. In light of the preceding, we must conclude that the testimony from the officers supports the district court's implied determinations that Nanny gave his consent for the officers to enter and search his home and that there was probable cause to associate with criminal activity the items seized after being seen in plain view. *Cf. McIntyre v. State*, Nos. 10-12-00321—00323-CR, 2013 WL 5773343, at *6-7 (Tex. App.—Waco Oct. 24, 2013, pet. ref'd) (mem. op., not designated for publication) (explaining that there was probable cause to believe that defendant had committed offense of unlawful possession of controlled substance where plastic

18

bag filled with "a white, crystal substance" was seen in plain view, where officers believed that substance was methamphetamine, and where "[f]ield tests confirmed that the contents of the . . . bag was indeed methamphetamine"); *Brochu v. State*, 927 S.W.2d 745, 750 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (determining that trial court did not abuse its discretion by denying motion to suppress where police officer testified that he observed what "appeared to be a crack pipe" with burnt residue on socket, where officer field tested residue, and where test was positive for cocaine).[2]

For all of these reasons, we cannot conclude that the district court abused its discretion by denying Nanny's motion to suppress, and accordingly, we overrule Nanny's sole issue on appeal.

## CONCLUSION

Having overruled Nanny's sole issue on appeal, we affirm the district court's judgment of conviction.

---

[2] During the suppression hearing, Officer Smith also testified regarding other contraband that he discovered while at Nanny's home. In particular, Officer Smith explained that he found "[a] green container" inside one of Nanny's jackets "containing a green leafy substance residue, . . . which I recognize[d] as marijuana." Further, Officer Smith related that he discovered the container after taking Nanny out of the home before Officer Cole arrived. When describing how he found the container, Officer Smith explained that Nanny stated that he was cold and told Officer Smith to retrieve one of his jackets for him to wear, and Officer Smith recalled that he "patted it for weapons to make sure I wasn't going to give him something with weapons [i]n it." On appeal, Nanny does not address the seizure of the container or argue that the district court abused its discretion by failing to suppress evidence regarding the container.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   November 30, 2016

Do Not Publish